## JULIUS DORSEY FISHER ET UX. *v.* JOHN ANTHONY McGUIRE ET UX.

[No. 157, September Term, 1977.]

*Decided May 8, 1978.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE, ORTH and COLE, JJ.

*Gloria M. Belgrad,* with whom were *Alan R. Sachs* and *Paul M. Vettori* on the brief, for appellants.

*James J. Casey* for appellees.

DIGGES, J., delivered the opinion of the Court.

The question presented for our determination in this equity action to set aside and cancel a deed is whether such an instrument can transfer title, through subsequent

acknowledgment and delivery by the grantor, when the name of the grantor was actually placed on the document by another. We conclude that it can.

The record in this case, which originated in the Circuit Court for Calvert County (Bowen, J.) and is before this Court on certiorari without prior consideration by the Court of Special Appeals, exhibits few differences between the parties concerning the early background of their dispute. We tell the story in capsule manner. In 1915 appellant Julius Dorsey Fisher, then an infant two years of age, went to live with his grandmother, Sarah E. Dorsey, and her unmarried daughter, Mary Grace Dorsey. The 77¾ acre farm owned by the grandmother, located near Broome's Island in Calvert County, was their home and is the property which has become embroiled in this litigation. Julius, under the watchful eye of his grandmother and aunt, grew to manhood there, helping with the home chores as a youngster and with the field work as he grew older. He enjoyed a particularly close relationship with his two guardians and during the latter days of his grandmother's life did much to comfort and care for her.

Upon Mrs. Dorsey's death in 1937 title to the farm passed under her will to her daughter, Mary Grace. Following the death of his grandmother Julius continued to live with his schoolteacher aunt, working the land just as he had for a number of years, until he was drafted into military service in 1942. During the period her nephew was in the service, Miss Dorsey retired from teaching and after living a short time with her sister, Emaline Farrell, moved in 1945 to the home of appellees John A. and Mildred S. McGuire, Mildred being Miss Dorsey's niece. Upon his separation from the service Julius did not return to the farm but established a residence in suburban Prince George's County. His aunt continued to reside with the McGuires until 1972 when, because of failing health, she moved to a nursing home where she died in 1975.

The evidence establishes that in 1954, twenty-one years before her death, Miss Dorsey, without informing any of her relatives except Julius of her intention, conveyed a one-half interest in her property to her nephew, with the consequence

that the two owned the farm as joint tenants.[1] In the years which followed the creation of this joint ownership, appellant and his aunt shared the payment of taxes and other expenses, leased the land to tenant farmers, assumed and discharged a joint obligation for money they borrowed from the Federal Land Bank, and in general dealt with the property as compatible co-owners. However, in 1962 the serenity of the arrangement ended when Mrs. Farrell fortuitously learned about the property transfer to appellant by reading her sister's mail. Reacting to this newly-acquired information, Mrs. Farrell emphatically made known her displeasure concerning the transfer, both to her nephew Julius and to her sister Grace. Following a verbal altercation at the McGuire home on Palm Sunday of 1963, with Mrs. Farrell demanding of Julius that he surrender the rights he had acquired in the farm, appellant's contacts with his Aunt Grace became minimal. After that he saw her on only a few occasions, once in 1969 in the hospital where she was confined with a broken hip, and several times after she moved into the nursing home in 1972; on the latter occasions he was unable to communicate with his aunt because she had been robbed of her ability to speak by a stroke.

The deed which is the subject of this dispute was purportedly executed by Mary Grace Dorsey on December 28, 1963, and was recorded among the land records of Calvert County on January 16, 1964. It conveyed, this time without Julius' knowledge, Miss Dorsey's remaining one-half interest in the farm to the appellees. Thus by operation of law the joint tenancy was converted into a tenancy in common between the McGuires and Julius Fisher. James M. Rea, now a Maryland district court judge but at the time an attorney in private practice, testified that Miss Grace Dorsey, pursuant to appointment, came to his law office and, after informing him that she did not desire to disturb Mr. Fisher's interest in the farm other than to destroy the joint tenancy, employed him

---

1. Miss Dorsey wrote her attorney instructing him to prepare the necessary documents to accomplish the transfer. In that letter she made known to him her wishes as well as the wishes of her late mother, as she perceived them, that Julius be made "an equal share owner of [her] farm with [her] while [she was] living, and [that] he ... become sole owner should he survive [her]."

to draft the necessary deed conveying her one-half interest to the appellees. Accordingly, the attorney prepared the deed and sent it to his client at the McGuire home for execution by her; he recorded the instrument when it was returned to him, but had no knowledge of the circumstances of its signing.[2]

When the appellant learned from Mr. McGuire in early 1964 of the existence of the Dorsey-to-McGuire deed he asked his attorney to check on the matter. Upon being informed that such a conveyance had been recorded, the appellant accepted the transfer as being in accord with the wishes of his aunt; he dealt with the appellees as co-owners until, based on a fall 1975 neighborhood rumor that the McGuires did not obtain a good title to the one-half interest, his suspicion was aroused and he went to the land record office to personally examine the McGuire deed. Mr. Fisher relates that immediately upon viewing the purported signature of his Aunt Grace on the official microfilm copy of the instrument, he realized it was not her writing. Consequently, on April 6, 1976, appellant instituted this suit to cancel the Dorsey-to-McGuire deed as a forgery.

With this background and other evidence before him, Judge Bowen made factual determinations which we cannot say are clearly erroneous under Maryland Rule 886, as well as legal conclusions based on those factual determinations. In pertinent part we relate these factual and legal conclusions:

> Either somebody signed that deed and she adopted it as her own signature before the notary or the notary had to help her with the signing of the deed because manifestly that isn't her signature. She didn't write her name that way. It just isn't something which she wrote. We are prepared to say and we are prepared to find as a fact that she did not in fact do that writing unassisted. I am not prepared to say she didn't have her hand on the pen or

---

2. In addition, Judge Rea says he followed Miss Dorsey's instructions and prepared a trust agreement whereby the appellees were to acknowledge that they held title to the one-half interest in the farm in trust for their minor son, Barry.

something but clearly [from] the expert testimony and the evidence of anyone who wishes to compare these legitimate signatures with that one [, the writing is not hers.] No evidence to rebut or contradict the [handwriting] expert's testimony has been offered except the vague and imperfect recollection of the notary public, whose testimony we think is valueless beyond the fact that her name appears on the document and she did in fact go [to the McGuire home] and Miss Grace did, in fact, acknowledge this deed as her deed in front of her. More than that, [the notary] obviously had no present recollection about any of this. . . . The only thing she is able to say is that she went there, she went in the room with Miss Grace and Miss Grace said here is the deed. This is my deed, please put your notary seal on it. We think that is tantamount to saying I validate this instrument and we think that regardless of whether or not she was the one that signed it, that deed was during her lifetime acknowledged and ratified by her. And for this reason, we think that the deed is a valid deed.

\* \* \*

. . . [T]he conclusion the Court reaches is that while Miss Grace may not have, in fact, written her name on that instrument, she did, in fact, intend for it to [be] executed. She did, in fact, ratify it after it had been executed and instruct both the McGuires and others to act upon it and . . . Mr. Fisher, the plaintiff in this case, who had knowledge of it, was unable to show by his proof and indeed his direct testimony is very clear on this point that she never indicated to him in any way or he in any way to her that this was not her wish and that he did not acquiesce in it.

The appellant urges that, because the trial court found Miss

Dorsey's name on the deed to be a forgery,[3] no title passed under that instrument to the grantees; he claims the deed is thus void for all purposes to the same extent as if it had never existed. Although we do not read the trial court's findings as concluding that the signature on the deed was a forgery, for the purposes of this appeal we will assume the judge did make such a factual determination. Nevertheless, since the trial court in addition clearly concluded that Miss Grace Dorsey adopted the writing on the deed as her signature, by formally acknowledging the instrument to be her act and by delivery of it to the grantees for recording, we agree with the court's further conclusion that title to her one-half interest passed to the McGuires.

Dating with certainty from Lord Ellenborough's opinion in 1814 in *Schneider v. Norris,* 2 Maule & S. 286, 105 Eng. Rep. 388, it has been almost universally recognized both in England and in this country that a person's name, whether signed by another or mechanically printed, constitutes a valid signature of that person when he recognizes and appropriates it as his. And formal acknowledgment of the instrument by one whose name is signed on it by another results in the signature becoming, by adoption, that of the one who acknowledges it. The signature, in these circumstances, is as effective as if the person's hand had guided the pen over the paper. *See* Annot., 57 A.L.R. 525 (1928 & supplements) (collecting decisions from twenty-four jurisdictions); 3 *American Law of Property* § 12.58, at 302 (A. Casner ed. 1952); 4 H. Tiffany, *The Law of Real Property* § 1023, at 318 (3d ed. 1975). The decisions of this Court are in accord. *See Dubrowin v. Schremp,* 248 Md. 166, 172, 235 A. 2d 722, 725 (1967); *Smith v. Goldsborough,* 80 Md. 49, 58-59, 30 A. 574, 575 (1894); *Drury v. Young,* 58 Md. 546, 553-54 (1882). The rationale for the conclusion we express here can best be explained by pointing out that the acts of formally acknowledging a deed before a state official and of delivering the document to the grantee are so positive and emphatic that the grantor is deemed to have adopted the signing, no matter

---

3. For statutory provisions requiring that a deed be executed, see Md. Code (1974), §§ 4-101 & 5-103 of the Real Property Article.

who actually performed that act, nor whether it was done with or without the grantor's consent. In other words, by completing the instrument with the final acts of acknowledgment and delivery, the grantor adopts its contents and makes the deed his in all its particulars to the same extent as if he had by his own hand written each word contained in it.[4]

Accordingly, we agree with the chancellor that given the facts as he determined them, title to the remaining one-half interest in the Calvert County farm owned by Mary Grace Dorsey in 1963 passed to the grantees.

*Decree affirmed.*

*Costs to be paid by the appellants.*

---

4. In this regard it is important to recognize that the deed is sustained on the ground of adoption, and not by virtue of acts performed by an agent, so that compliance with Md. Code (1974), § 4-107 of the Real Property Article, which requires that an agent's authority to grant property be executed in the same manner as a deed, is not an issue here.