73 A.3d 161

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Thomas Patrick DORE.**

**Misc. Docket AG No. 35, Sept. Term, 2012.**

Court of Appeals of Maryland.

Aug. 20, 2013.

James P. Botluk, Assistant Bar Counsel (Glenn M. Grossman, Bar Counsel, Attorney Grievance Commission of Maryland), for Petitioner.

Alvin I. Frederick, Esquire (of Eccleston & Wolf, Hanover, MD), for Respondent.

Argued before BARBERA, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, McDONALD and BELL,* JJ.

ADKINS, J.

This case involves a variation on the notorious practice of "robo-signing," which flourished during the recent foreclosure boom. *See* Alan M. White, *Losing the Paper—Mortgage Assignments, Note Transfers and Consumer Protection,* 24 Loy. Consumer L.Rev. 468, 469–70 (2012). "Robo-signing" is a term that "most often refers to the process of mass-producing affidavits for foreclosures without having knowledge

---

* Bell, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

of or verifying the facts." Anita Lynn Lapidus, *What Really Happened: Ibanez and the Case for Using the Actual Transfer Documents*, 41 Stetson L.Rev. 817, 818 (2012).

In the present case, a Maryland lawyer, Thomas Patrick Dore, authorized his employees to sign his name on affidavits filed in foreclosure actions. The employees did not only sign the affidavits as Dore; they also notarized the bogus signatures. This practice came to the attention of a circuit court judge, who gave Dore "a private admonition" pursuant to Canon 3F of the former Maryland Code of Judicial Conduct.[1] The judge warned Dore that "if this practice ... of using false notaries" continues, he "will initiate a formal report of the matter to the Attorney Grievance Commission." Dore heeded this warning: he stopped the practice, hired ethics counsel, and approximately a month later reported his conduct to the Attorney Grievance Commission of Maryland ("AGC").

AGC filed a Petition for Disciplinary or Remedial Action, charging Dore with violating four provisions of the Maryland Lawyers' Rules of Professional Conduct: Rule 3.3 (candor toward the tribunal); Rule 5.3 (responsibilities regarding non-lawyer assistants); Rule 8.4(c) (dishonesty, fraud, misrepresentation); and Rule 8.4(d) (misconduct prejudicial to the administration of justice). The hearing judge found that Dore violated Rules 3.3(a)(1), 5.3(a)(1) and 8.4(d), but not Rule 8.4(c).

## THE HEARING JUDGE'S CONCLUSIONS

The disciplinary hearing was held before a judge of the Circuit Court for Baltimore County. The parties stipulated to the admission of all the documentary evidence offered, as well as the facts. Dore was the sole witness at the hearing. The

---

**1.** This canon is now codified as Rule 2.15 of the Maryland Code of Judicial Conduct, found at Maryland Rule 16–813. It requires judges to "take or initiate appropriate corrective measures with respect to the unprofessional conduct of another judge or lawyer." The rule provides that, if a corrective measure taken by the judge is "not successful, [the] judge shall inform the Attorney Grievance Commission...."

hearing judge adopted the parties' stipulated facts, making the following findings of fact by clear and convincing evidence:

## I. Respondent's Background

Mr. Dore was admitted to the Bar of the Court of Appeals on June 14, 1988.... With the exception of approximately nine months, [he] has spent his entire legal career at [the law firm now known as Covahey, Boozer, Devan & Dore, P.A.], where he is now one of two majority stockholders.... Since approximately 2001, the Respondent's practice has concentrated in the representation of lenders in actions to foreclose mortgages and/or deeds of trust. Foreclosures constitute approximately 70% of his practice. As of May 2010, the Respondent was counsel of record in 1,225 foreclosure cases pending throughout the State of Maryland.

... Covahey & Boozer had a foreclosure practice since the firm's inception in the early 1970s. The Respondent received his training in the areas of foreclosure law from his experience at the firm and the firm's foreclosure practices remained essentially unchanged until 2008, when a change in the law governing foreclosures in the State of Maryland was enacted.

## II. The 2008 Economic Crisis

\* \* \*

There was a marked increase in the volume of foreclosure files received by Respondent's firm as a result of the January 2008 severe global economic downturn. For example, the Respondent testified that, in the fall of 2008, the firm's monthly volume of foreclosure files increased from 100 to 500–600 per month. At its peak, the monthly volume of foreclosure files received was 1,000–1,200 per month, representing a 1,100% increase from 2007.

Faced with this exponential increase in foreclosure files, the firm increased its staff of lawyers and non-lawyers. By the fall of 2008, the firm employed approximately 100 non-

lawyer employees and 6 or 7 lawyers whose practice was devoted primarily to foreclosure actions. . . .

### III. Significant Changes in Maryland Foreclosure Law

Mr. Dore testified that at the same time that the monthly volume of foreclosure files was increasing exponentially, the laws and procedural rules governing foreclosure law in the State of Maryland changed. . . . Significantly, the changes in 2008 and almost every year thereafter required more affidavits to be filed in the foreclosure action. There are now approximately sixteen (16) affidavits which must be filed in every foreclosure action. A notary attestation was and is not required on any of the affidavits.

Several of these affidavits required the same information in the same format as had been required under pre-existing Maryland law for approximately twenty (20) years. Accordingly, the firm still used the same forms, which essentially remained unchanged since the firm's inception.

Around the time of the economic downturn, the Respondent began to modify the forms and was overseeing the firm's switch to a new case management system to streamline the drafting and preparation of the documents. The Respondent testified that he became distracted by the increase in volume and ensuring that the review process was conducted properly for the large influx in files and did not follow up on the updating of the forms filed with the courts.

### IV. Mr. Dore's Delegation of Signatures

The Respondent directed that his name appear on all documents filed in foreclosure cases, despite the fact that the volume was increasing exponentially and it would have been impossible for him to review and sign every document. The Respondent authorized others to sign his name because he believed that, as the principal responsible for the foreclosure department in his firm, it was appropriate for the form to be in his name only. The Respondent testified that foreclosure can be a very stressful experience and that, on occasion, defaulting borrowers named his employees in friv-

olous law suits or even threatened their physical safety. He caused his name to be on all documents so that he would be the one targeted instead of his employees.

The Respondent described in his testimony an episode in which one of his employees received threatening phone calls from a retired police officer whose home was in foreclosure. During the call, the borrower indicated that he knew where the employee lived, her home phone number, and her daughter's address and telephone number. The borrower threatened to kill Mr. Dore's employee, her daughter, and her co-workers.

\*　　\*　　\*

Recognizing that it was impossible for him to sign every document, but mindful of the fact that he did not want his employees' names to go on the papers for their own protection, the Respondent researched the legality of authorizing another person to sign one's name. [H]e reached the conclusion that he could do so. Specifically, the Respondent read the case of *Fisher v. McGuire*, 282 Md. 507 [385 A.2d 211] (1978), and relied upon that case for the proposition that an individual can adopt the signature of that person's name when signed by another person. The Respondent now recognizes that his research did not relate to the issue of signatures before notaries.

Additionally, the Deed of Substitution of Trustees for the Deed of Trust states that any one of the substituted trustees can act for the other. Mr. Dore interpreted this to mean that the other Substitute Trustees can sign the name of another Substitute Trustee. However, the Respondent acknowledged that he authorized two non-lawyer employees, who were not substituted trustees, to sign his name to the affidavits.

Despite the fact that non-lawyers signed Mr. Dore's name to these documents, the review process conducted by Respondent's law firm of these documents was stringent. . . . Although some documents were signed by non-lawyers, Respondent testified that an attorney always reviewed all of

the documents prior to submission to the Court. No inaccuracies had been cited or found in any of the Affidavits filed in the foreclosure actions by the Respondent's firm. [Footnotes omitted.]

## V. Judge Caroom's April 8, 2010 Letter

On April 12, 2010, Respondent received a letter . . . from the Hon. Philip T. Caroom of the Circuit Court for Anne Arundel County privately admonishing him for what appeared to Judge Caroom to be blatant irregularities in his signature on documents filed in foreclosure actions. . . . Upon receipt of Judge Caroom's letter, the Respondent immediately ceased the practice of allowing others to sign his name to Affidavits or any other document and conducted a review of all affected files. The Respondent directed that no one was authorized to sign any name but their own. The first time it ever occurred to Mr. Dore that the Affidavits were being notarized was when he received and reviewed Judge Caroom's letter.

In addition to stopping the practice, the Respondent immediately met with his partners to discuss the matter, contacted ethics counsel that same day, met with counsel within the week, and notified his clients of the problem and the need to take action to correct the problem. After meeting with counsel, the Respondent determined the inappropriateness of the method he had permitted to be used for the filing of foreclosures and self-reported the conduct to Bar Counsel on May 3, 2010, less than one month after receiving Judge Caroom's letter. . . .

## VI. Corrective Action by Respondent

The Respondent devoted the entire month of May 2010 to trying to correct the problem. He reviewed the files likely to contain affidavits on which his employees signed his name, assisted by two or three paraprofessionals. The Respondent's review encompassed all files in which the Court had not ratified the sale.

... In cases where the Respondent could positively determine that signatures were not his own, he drafted, executed, and filed corrective affidavits. These affidavits acknowledged that, while the signature of the Respondent was not genuine and the notary attestation was inappropriate because the Respondent did not appear before the notary, the facts in the body of the original Affidavits were true and correct to the Respondent's knowledge.

The financial cost of the corrective efforts was significant. The Respondent's law firm paid approximately $120,000 to $180,000 in out-of-pocket costs. These costs do not include his billable time spent reviewing, preparing and signing the corrective Affidavits, the salaries of the employees who spent time away form other work correcting the problem, and other related expenses such as postage, additional advertising, and court costs. The Respondent's law firm also reserved approximately $250,000 on its balance sheet as funds the firm may have to pay in the event that any of its clients lose money based on the delayed sales of the properties.... Additionally, the firm has paid all the costs of dismissal and re-filing of foreclosure cases impacted by the affidavit problem.

Despite the fact that the Respondent's clients may have suffered delays in the foreclosure process, the Respondent did not lose any clients as a result of these proceedings. The Respondent testified that his clients appreciated that he immediately advised them of the problem and took complete responsibility.

\* \* \*

## VII. New Review Process Instituted

After the Respondent realized the inappropriateness of his law firm's former review process for foreclosure files, the firm instituted new procedures. The Respondent's name is no longer pre-printed on all foreclosure filings.... The Respondent testified that the updated forms now print with a list of all the substitute trustees' names. After reviewing the file to ensure that every factual assertion in

the document is correct, the substitute trustee checks the box next to his or her name and signs accordingly.... (Footnotes and citations omitted).

From these facts the hearing judge concluded that Respondent violated Rules 3.3(a)(1), 5.3(a)(1), and 8.4(d), but not Rule 8.4(c).

## I. Rule 3.3(a)(1)

The Court finds that the facts prove by clear and convincing evidence that the Respondent violated Rule 3.3(a)(1).

Rule 3.3(a)(1) provides that a lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer.

The Court concludes that the Respondent made a false statement of fact to the Court and therefore violated Rule 3.3(a)(1) when he (1) authorized non-lawyer employees to sign his name in affidavits filed with the Court and (2) his employees affixed a notary seal to those affidavits attesting that the Respondent appeared before the notary when in fact he had not done so.

## II. Rule 5.3(a)(1)

The Court finds that the facts prove by clear and convincing evidence that the Respondent violated Rule 5.3(a)(1).

Rule 5.3(a)(1) states that

[w]ith respect to a nonlawyer employed or retained by or associated with a lawyer: a partner, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer.

The Respondent permitted two non-lawyer employees to sign his name to affidavits filed with the Court. After receiving Judge Caroom's April 8, 2010 letter, the Respon-

dent discovered that the practice had spread and additional employees regularly signed his name. Furthermore, the Respondent first realized that the affidavits were being notarized when he received Judge Caroom's letter. By permitting a non-lawyer to sign his name without proper attribution on documents filed with the Court, the Respondent failed to supervise his employees in a manner consistent with his obligations under the Rules of Professional Conduct. By allowing the affidavits to be notarized by his employees, even though he did not realize the affidavits were being notarized, the Respondent did not make reasonable efforts to ensure that his firm had in effect measures giving reasonable assurance that his employees' conduct was compatible with the Respondent's professional obligations.

### III. Rule 8.4(d)

The Court finds that the facts prove by clear and convincing evidence that the Respondent violated Rule 8.4(d), which provides that "it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice."

"In general, an attorney violates Rule 8.4(d) when his or her conduct impacts negatively the public's perception or efficacy of the courts or legal profession." *Attorney Grievance Comm'n v. Rand*, 411 Md. 83, 96 [981 A.2d 1234] (2009). The Respondent's actions contributed to the need for a change in the Rules governing foreclosure actions. These kind of irregularities motivated Governor O'Malley and members of the Maryland Congressional delegation to seek a halt of foreclosure actions in Maryland.... Conduct of the type that the Respondent engaged in this case inevitably leads the public to distrust the legal profession and casts a negative light on the court system.

The Respondent's extensive foreclosure practice brought him into every jurisdiction in the State.... The Circuit Courts in five counties and Baltimore City were required to hold hearings to determine the validity of the Respondent's filings, forcing delays in the foreclosure proceedings and

their ultimate disposition. The need for those hearings and the need to file Supplemental Corrective Affidavits in each case in which post-foreclosure filings were made negatively impacted the efficacy of the courts.

## IV. Rule 8.4(c)

The Court does not find that the Petitioner proved by clear and convincing evidence that the Respondent violated Rule 8.4(c).

Rule 8.4(c) states that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation. The Rules do not define dishonesty, deceit or misrepresentation. "To determine the ordinary meanings of those words [it is appropriate] to consult their dictionary definitions." *Bd. of Educ. v. Marks–Sloan,* 428 Md. 1, 28 [50 A.3d 1137] (2012).

Webster's New World Dictionary ("Webster's") defines "dishonesty" as "being dishonest," which in turn is defined as "lying" and "cheating." Webster's New World Dictionary (4th ed. 2003). Black's Law Dictionary ("Black's") defines "dishonesty" as a "disposition to lie, cheat, deceive or defraud. . . ." Black's Law Dictionary (9th ed. 2009). The conduct described in these definitions involves lying or the intent to commit fraud. There is no evidence in the record that the Respondent intended to commit a fraud or to lie. In fact, the opposite appears to be true. The parties agree that there was only one inaccuracy in any of the affidavits filed and that matter was corrected as soon as it was discovered.

Fraud is statutorily defined as "conduct that is fraudulent under the substantive or procedural law of [Maryland] **and has a purpose to deceive.**" *Md. R. Prof'l Responsibility 1.0(e)* (emphasis added). "This does not include merely negligent misrepresentation or negligent failure to apprise another of relevant information." *Id.* cmt 5. The Respondent's behavior and actions are certainly negligent and careless, but there is nothing in the record to suggest his actions were motivated by a "purpose to deceive."

"Deceit" is "lying" according to Webster's. Black's defines it in more detail as "[t]he act of intentionally giving a false impression." There is no evidence in the record that Respondent lied or intended to mislead anyone. The affidavits, save one, were truthful; none were intentionally misleading.

As used in this Rule, a "misrepresentation is made when the attorney 'knows the statement is false,' and cannot be 'the product of mistake, misunderstanding, or inadvertency.'" *Attorney Grievance Comm'n v. Zeiger*, 428 Md. 546, 556 [53 A.3d 332] (2012) (quoting *Attorney Grievance Comm'n v. Siskind*, 401 Md. 41, 68–69 [930 A.2d 328] (2007)). *See also Attorney Grievance Comm'n v. Nichols*, 405 Md. 207 [950 A.2d 778] (2008). Black's defines "misrepresentation" as "the act of making a false or misleading assertion about something, usually, with the intent to deceive." Based upon the evidence submitted by both parties, the Respondent's practice of allowing his employees to sign his name to affidavits was based on a mistaken belief that he was permitted to do so under Maryland law. It was not a knowingly dishonest act. The record is devoid of clear and convincing evidence that Respondent intentionally misled anyone or the Court when he permitted non-lawyer employees to sign his name to affidavits submitted in foreclosure actions. The Respondent, based upon a misunderstanding or misapplication of Maryland case law, had a good-faith but mistaken belief that he could authorize others to sign his name. The Respondent testified that he did not know that the affidavits were being notarized, although perhaps he should have known. However, a violation of Rule 8.4(c) cannot rest upon a mistake or failure to properly supervise employees. Accordingly, the Court concludes that the Respondent did not violate Rule 8.4(c). (Citations omitted).

Having found that Dore violated Rules 3.3(a)(1), 5.3(a)(1), and 8.4(d), the court went on to consider mitigation evidence presented by the Respondent. It found the following mitigation factors existed:

### a. Absence of prior disciplinary record

The Respondent has been a member of the Bar of the Court of Appeals of Maryland since 1988. In his over twenty-four (24) years at the Bar, the Respondent has never been disciplined nor has he ever been a respondent in a case filed in the Court of Appeals by the Attorney Grievance Commission of Maryland. The Court concludes by a preponderance of the evidence that the Respondent's absence of prior disciplinary record mitigates his misconduct in this case.

### b. Absence of a dishonest or selfish motive

This Court finds that the Respondent's misconduct is mitigated by the fact that it was not motivated by a dishonest or selfish motive. The process currently utilized by the Respondent's law firm to review and file documents in foreclosure cases does not take longer or costs more than the process used before.

The Respondent's practice of allowing others to sign his name to the documents was in fact prompted by an unselfish motive. The Respondent specifically decided to have his name listed in the signature block of documents filed in foreclosure cases to protect his employees from harassment, lawsuits, and threats of violence by borrowers whose homes were in foreclosure.

### c. Respondent made timely good faith efforts to make restitution or to rectify consequences of misconduct

This Court finds that the Respondent's timely good faith efforts to rectify the consequences of the misconduct mitigate his misconduct. Upon receiving Judge Caroom's letter, the Respondent immediately stopped the offending practice, instructed his employees that no one was permitted to sign his name to any document, met with his partners, engaged and consulted with ethics counsel, and self-reported his misconduct to Bar Counsel.

Additionally, the Respondent and employees of his law firm undertook an extensive review of all affected files. The Respondent's firm has already spent approximately $120,000 to $180,000 and may spend up to $500,000 to correct this problem, not including outside counsel fees for representation of the firm in show cause hearings and other proceedings related to the affidavit issue.

In addition to the money spent to correct the problem, Respondent spent almost one month away from his regular practice reviewing files and preparing, executing and filing corrective Affidavits. Despite the fact that as of 2010 the Respondent was counsel of record in 1,225 foreclosure cases throughout the state, no one has cited any inaccuracies in these Affidavits; this demonstrates that although the firm's signature process may not have been appropriate, its review of the files prior to signing them was thorough.

### d. Respondent made a full and free disclosure to the disciplinary board and displayed a cooperative attitude throughout these proceedings

The Respondent self-reported his misconduct to Bar Counsel less than one month after he received Judge Caroom's April 8, 2010 letter.... This Court finds that the fact that Respondent self-reported his misconduct to Bar Counsel mitigates his misconduct by a preponderance of the evidence....

The Court also finds by a preponderance of the evidence that Respondent's cooperative attitude toward the disciplinary proceedings mitigates his misconduct. Respondent has fully cooperated with Bar Counsel and made efforts to streamline the process with Bar Counsel. The hearing before this Court was evidence of Respondent's cooperative attitude toward the proceedings. The parties proceeded on a Joint Statement of Stipulated Facts. Respondent was the only witness who testified at the hearing. The Respondent has taken full responsibility for the misconduct and never denied that it was improper. The Court concludes that this level of cooperation and participation in the disciplinary

proceeding is precisely how a lawyer should behave in these situations and accordingly finds that such behavior mitigates the misconduct.

### e. Character or reputation in the community

The Court finds by a preponderance of the evidence that the Respondent's good character and reputation in the community mitigates the misconduct charged in this case. The Respondent submitted eleven letters attesting to his good character and his reputation as a well-respected lawyer in both the local community and the national mortgage banking legal community. . . .

\* \* \*

In addition to the character letters, the Respondent described in his testimony a situation in which, while representing a lender in a foreclosure proceeding, he had been working with a borrower in default to obtain a loan modification from the lender. The borrower was able to reach an agreement with the lender, but when the time came to make the payment, the borrower was $200 short of the full payment amount. Although the Respondent could have simply rejected the payment of the basis that it was not the agreed upon amount, the Respondent directed his staff to make up the difference and pay the lender the additional $200 so that the borrower could remain in her home. This episode, together with the written attestations to his good character submitted by members of the community, demonstrates that the Respondent's good character compels him to help those in need, while still protecting the interest of his clients.

### f. Imposition of other penalties or sanctions

The Court finds by a preponderance of the evidence that the significant press coverage of the issue and the considerable time and effort that the Respondent and his firm have spent correcting the problem mitigate his misconduct in this matter. The Respondent testified that he attended show

cause hearings regarding the signature issue in five counties in Maryland, including Baltimore City, and testified about his signatures on both the original Affidavits and the corrected Affidavits. The Court finds that the time and effort spent appearing at these hearings and the negative press coverage of the issue are negative consequences that might mitigate the Respondent's misconduct.

### g. Remorse

The Court finds by a preponderance of the evidence, based on the Respondent's testimony and his demeanor on the stand, that the Respondent recognizes his errors and is truly remorseful for this conduct. The Respondent testified that he regrets what he did, not simply because of the expensive, time-consuming, and emotionally burdensome disciplinary process, but mostly because he disappointed his profession, his partners and his family. The Respondent specifically testified that he regrets the fact that the Notary Public Commissions of several of his employees have been called into question because the purpose of directing employees to sign his name was to protect them. (Footnote and citations omitted).

\* \* \*

### DISCUSSION

■ Neither Bar Counsel nor Respondent have filed exceptions to the hearing judge's findings of fact or conclusions of law. They disagree only on the appropriate sanction.

■ When neither party files exceptions to the factual findings, this "Court may treat the findings of fact as established for the purpose of determining appropriate sanctions, if any." Md. Rule 16–759(b)(2)(A). As for the hearing court's legal conclusions, even when there is no challenge, they are still subject to de novo review. *Id.* 16–759(b)(1). That is so because "this Court has original and complete jurisdiction" in attorney grievance matters. *Attorney Grievance Comm'n v. McClain*, 406 Md. 1, 17, 956 A.2d 135, 144 (2008). We hold that Dore violated Rules 3.3(a)(1), 5.3(a)(1), and 8.4(d).

## Rule 3.3(a)(1)

█ Rule 3.3(a)(1), which is titled "Candor Toward the Tribunal," prohibits a lawyer from knowingly "mak[ing] a false statement of material fact or law to a tribunal or fail[ing] to correct a false statement of material fact or law previously made to the tribunal by the lawyer." As one court emphasized:

the requirement of candor towards the tribunal . . . requires every attorney to be fully honest and forthright. . . . Every court . . . has the right to rely upon an attorney to assist it in ascertaining the truth of the case before it. Therefore, candor and fairness should characterize the conduct of an attorney at the beginning, during, and at the close of litigation.

*In re Discipline of Wilka,* 638 N.W.2d 245, 249 (S.D.2001) (citation omitted).

█ "[A] finding that Respondent violated 3.3(a)(1) requires clear and convincing evidence that he knew the statements made were false." *Attorney Grievance Comm'n v. Ward,* 394 Md. 1, 32, 904 A.2d 477, 495 (2006) (citation omitted). The "clear and convincing" evidence requirement "does not call for 'unanswerable' or 'conclusive' evidence." *Attorney Grievance Comm'n v. Fader,* 431 Md. 395, 406, 66 A.3d 18, 24 (2013) (citation omitted). Rather, "[t]he quality of proof, to be clear and convincing, [lies] somewhere between the rule in ordinary civil cases and the requirement of criminal procedure—that is, it must be more than a mere preponderance but not beyond a reasonable doubt." *Id.* (citation omitted).

There are cases in which we have found a violation of this rule based on a respondent's use of a signature. For instance, in *Attorney Grievance Commission v. Johnson,* the respondent signed a bankruptcy petition on behalf of his partner and two clients. 363 Md. 598, 608, 770 A.2d 130, 136 (2001). We held that, "[r]egardless of whether [the Respondent's law firm partner] agreed generally, at an earlier and undetermined date, to act as Maryland counsel for Respondent or his clients,

according to Respondent's own testimony, [the partner] did not authorize Respondent to sign [his] name on the bankruptcy petition." *Id.* at 622, 770 A.2d at 145. Because Johnson filed the petition bearing the partner's signature in court, but the partner did not actually sign or authorize it, we agreed with the hearing court that this action constituted a violation of Rule 3.3(a)(1). *Id.* at 624, 770 A.2d at 146; *see also Attorney Grievance Comm'n v. Gordon*, 413 Md. 46, 58, 991 A.2d 51, 58 (2010) (submitting a false signature on a contract in a breach of contract case was "clearly violative of MRPC 3.3(a)(1)").

This case is different in that the false statement pertained to the respondent's attempt to pass, as his own, signatures by his employees, who signed affidavits to be filed in court on his behalf and at his direction. Unlike signers in many other cases, whose signature were falsified, Dore did desire for the affidavits to be signed by him; he just did not have the time to do it. That does not make the contents of the representation any less false, however.

In the letter admonishing Dore for his conduct, Judge Caroom of the Circuit Court for Anne Arundel County pointed out that in two of Dore's cases, "the 'signature' which reports to be [Dore's] above notarizations does not match between the two (2) files. In each instance, the 'signature' is a capital D; however, it is difficult for the court to imagine that the same person signed both 'signatures' unless he or she are under the influence of drugs." Indeed, the hearing court found that the affidavits filed in court by Dore's firm contained statements that were false in two respects: the affidavits were purportedly (1) signed by Dore (2) in the presence of a notary. In actuality, however, they were signed by Dore's non-lawyer employees and contained an unlawful notary attestation that the signer was Dore personally.

We make additional distinctions. Under Maryland Rule 1–202(b), an affidavit is "a written statement the contents of which are affirmed under the penalties of perjury to be true." Rule 1–304 further provides:

The statement of the affiant may be made before an officer authorized to administer an oath or affirmation, who shall certify in writing to having administered the oath or taken the affirmation, or may be made by signing the statement in one of the following forms:

Generally. "I solemnly affirm under the penalties of perjury that the contents of the foregoing paper are true to the best of my knowledge, information, and belief."

Personal Knowledge. "I solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true."

Thus, the import of the affidavit form employed in the present case is that the affiant has read the affidavit and affirms—to the court—that the statements in the affidavit are true, based on the affiant's personal or best knowledge, information, and belief. It is because of this affirmation that "courts, with good reason and really of necessity, have relied on the accuracy of affidavits, especially when filed by attorneys, unless there is something on the face of the document to suggest otherwise or the validity of the affidavit is challenged." Alan M. Wilner, The Rules Committee, 166th Rep. 1 (Oct. 15, 2010), *available at* www.courts.state.md.us/rules/reports/166threport.pdf.

Dore, however, did not read all of the affidavits and did not ensure that the information contained therein was accurate.[2]

---

2. The hearing court found that Judge Caroom's letter was eye-opening for Dore, who, until receiving the letter did not know that multiple unauthorized employees were signing his name and notarizing his signatures. As for Dore's review of the documents, the hearing court found that, "[d]espite the fact that non-lawyers signed Mr. Dore's name to these documents, the review process conducted by Respondent's law firm of these documents was stringent.... Although some documents were signed by non-lawyers, Respondent testified that an attorney always reviewed all of the documents prior to submission to the Court." (Footnote omitted). Obviously then, Dore himself did not review at least some of the affidavits. At oral argument, the counsel defended on the grounds that "a lawyer" read the affidavits:

For instance, in Case No. 02–C–09–145991 in the Circuit Court for Anne Arundel County, an "Affidavit Pursuant to 7–105.9(C)(1)" purported to bear Dore's signature and stated:

> On this 3rd day of December, 2009, I solemnly affirm under the penalties of perjury that the foregoing are true and correct to the best of my knowledge, information, and belief:
>
> 1. That I, Thomas P.[ ] Dore, am a Substituted Trustee and authorized seller of the subject real property in the above-captioned case.
>
> 2. That I am at least eighteen (18) years of age and competent to testify.
>
> 3. That the NOTICE OF IMPEDING FORECLO-SURE SALE pursuant to 7–105.9(C)(1) was sent to ALL OCCUPANTS....
>
> 4. That the notice required pursuant to 7.105.9(C)(1) was sent....
>
> 
>
> _(Signed)_
> _____
>
> Thomas P. Dore
>
> 

Thus, in this example, despite making those statements, affirmed under the penalty of perjury, Dore did not review the affidavit before it was filed with the court. Dore did not make sure that he was, in fact, authorized to sell that particular property; he did not know whether notice was actually sent, or whether it complied with the statutory requirements. This amounted to knowingly making a false statement: Dore gave a blanket authorization to his employees to sign his name in all

---

COURT: Did your client say on the record anywhere, whether he reviewed the documents that were being filed with his name on them?

RESPONDENT'S COUNSEL: _I believe that the affidavits would have made the representation that they were reviewed and I can tell your honor that each of the foreclosure files that was filed with Mr. Dore's name on it was reviewed by a lawyer. I will also tell the Court, candidly, not all of them were signed by lawyers, but every file was reviewed by a lawyer...._

The review by other lawyers is a factor we will consider in mitigation, but it does not erase Dore's false statement to the court.

foreclosure cases to "affirm under the penalties of perjury" the truthfulness of information in the affidavits, regardless of any knowledge on his part about the particular case.

Thus, there is clear and convincing evidence that the affidavits contained false information. Although the hearing court found that Dore only knew that other people were signing the affidavits in his name, but not that "his" signatures were also notarized,[3] Dore's instruction to his employees that they sign the affidavits—in and of itself—amounted to knowingly making a false statement to a tribunal in violation of Rule 3.3(a)(1).

### Rule 8.4(c)

Like Rule 3.3(a)(1), Rule 8.4(c) addresses false statements. It prohibits a lawyer from "engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation." The two rules often overlap. *See* Douglas R. Richmond, *The Ethics of Zealous Advocacy: Civility, Candor and Parlor Tricks*, 34 Tex. Tech L.Rev. 3, 28 (2002) ("A lawyer that violates Rule 3.3(a) generally violates Rule 8.4(c) as well, and a lawyer that lies to a tribunal may be disciplined for violating Rule 8.4(c) without Rule 3.3(a)(1) ever being mentioned." (footnotes omitted)).

■■ Yet, the hearing court found Dore guilty of knowingly making a false statement in violation of Rule 3.3(a)(1), but not of engaging in conduct involving misrepresentation in violation of Rule 8.4(c). The court based this conclusion upon its finding that there was no clear and convincing evidence that Dore "intentionally misled anyone." Bar Counsel did not challenge this finding. Ordinarily, we will not look for additional violations where Bar Counsel filed no exceptions. We emphasize for future cases, however, that dishonesty and

---

**3.** We defer to the hearing court's finding on this issue even though we find unsettling that an attorney, who concentrates his practice in foreclosures and is in charge of "overseeing the firm's switch to a new case management system to streamline the drafting and preparation of the documents," does not know that the form still being used by his firm continued to contain a notarization component for the signer's signature in the affidavit.

misrepresentation under Rule 8.4(c) have no requirement of intent to deceive.

We have recently explained that, in the context of Rule 8.4(c), there is a distinction between fraud and deceit on the one hand, and dishonesty and misrepresentation on the other hand. In *Attorney Grievance Commmission v. Reinhardt*, for example, we stated that an intent to deceive is only relevant if Bar Counsel alleges fraud or deceit: "assuming that Bar Counsel alleged that an attorney engaged in fraudulent conduct, evidence as to an attorney's specific intent [to deceive] would be relevant and properly considered in assessing whether Rule 8.4(c) was violated." 391 Md. 209, 221, 892 A.2d 533, 540 (2006). To the contrary, we made clear that "specific intent is not a necessary ingredient of dishonesty or misrepresentation." *Id.* at 222, 892 A.2d at 540. Therefore, we held that the attorney in Reinhardt violated Rule 8.4(c) even though he did not make the false statement with the intent of deceiving anyone, but simply "because he was 'embarrassed.'" *Id.*

In *Attorney Grievance Commission v. Siskind*, this Court relied on *Reinhardt* and made clear that there is a distinction between "pure acts" and "false statements." 401 Md. 41, 70, 930 A.2d 328, 345 (2007). We explained that for "acts" alleged to be "fraudulent or deceitful," a "specific intent is typically necessary to be proven to demonstrate that the conduct in question was fraudulent in fact." *Id.* To the contrary, for "false statements" alleged to be dishonest or a misrepresentation, "there is no additional intent element, specific or otherwise, to prove." *Id.* Accordingly, in the context of Rule 8.4(c), so long as an attorney knowingly makes a false statement, he necessarily engages in conduct involving misrepresentation. No intent to deceive is necessary. *See also Attorney Grievance Comm'n v. Whitehead*, 405 Md. 240, 258, 950 A.2d 798, 809 (2008).

### Rule 5.3(a)

We agree with the hearing judge that Dore violated Rule 5.3(a). At the times relevant to this case, that rule provided:

With respect to a nonlawyer employed or retained by or associated with a lawyer: (a) a partner, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer.

Rule 5.3(a).

The hearing court found that Dore "permitted two nonlawyer employees to sign his name to affidavits filed with the Court." Moreover, after Dore was admonished by a circuit court judge, he "discovered that the practice had spread and additional employees regularly signed his name." And, the hearing court found that Dore did not even realize that the employees were notarizing the affidavits until after he was admonished. For that matter, he did not realize the firm's forms used in the foreclosure cases continued to contain a notary component.

As we noted in another case, "[a]ssuming arguendo that Respondent had no knowledge of the [irregularities], 'had [he] exercised a reasonable degree of supervision over [employee], he might have detected her error before any ethical proscriptions had been violated.'" *See Attorney Grievance Comm'n v. Glenn,* 341 Md. 448, 481, 671 A.2d 463, 479 (1996) (alterations in both) (citation omitted). Likewise, if Dore had exercised a reasonable degree of supervision over his employees and the firm's forms, he would have discovered that the affidavit-signing practice spread to employees to whom he gave no authorization and that his signatures were also unlawfully notarized. Dore's failure to do that clearly violated Rule 5.3(a).

### Rule 8.4(d)

Finally, Dore violated Rule 8.4(d). That rule provides that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice." An attorney's conduct rises to this level if it is so egregious

that it has a negative impact on the profession as a whole, leaving a bad mark on all of us. *See Attorney Grievance Comm'n v. Marcalus,* 414 Md. 501, 522, 996 A.2d 350, 362 (2010) (conduct prejudicial to the administration of justice is the type of "conduct that impacts on the image or the perception of the courts or the legal profession ... and that engenders disrespect for the courts and for the legal profession" (alteration in original) (citation and quotation marks omitted)). The prejudice to the administration of justice may also be measured by the practical implications the attorney's conduct has on the day-to-day operation of our court system. *See Attorney Grievance Comm'n v. Ficker,* 319 Md. 305, 315, 572 A.2d 501, 505–06 (1990) ("We have held that failure to be punctual in a scheduled court appearance is not only detrimental to the administration of justice but also constitute[s] discourteous conduct degrading to the tribunal." (alteration in original) (citation and quotation marks omitted)).

Dore's conduct was prejudicial to the administration of justice both because it severely undermined the public's trust in the legal profession, and because it wasted judicial resources. The trial court found that Dore improperly instructed his employees to sign his name on affidavits in foreclosure actions, failed to realize that those affidavits were unlawfully notarized, and allowed those false affidavits to be filed in court. The hearing court found that Dore's conduct was the type of conduct that "inevitably leads the public to distrust the legal profession and casts a negative light on the court system." Furthermore, because Dore's "extensive foreclosure practice brought him into every jurisdiction in the State," "Circuit Courts in five counties and Baltimore City were required to hold hearings to determine the validity of [Dore's] filings, forcing delays in the foreclosure proceedings and their ultimate disposition. The need for those hearings ... negatively impacted the efficacy of the courts."

For reasons stated below, we agree with the hearing court's legal conclusions on this point.

### The Robo–Signing Scandal

For years, in foreclosure actions in Maryland, "courts, with good reason and really of necessity, have relied on the accuracy of affidavits, especially when filed by attorneys, unless there is something on the face of the document to suggest otherwise or the validity of the affidavit is challenged." Wilner, *supra* at 1. This system of trust collapsed with the shocking discovery that in thousands, if not tens of thousands, of residential foreclosure actions, the affidavits filed with the courts were "bogus": "the affiant either did not have sufficient knowledge of the facts stated in the affidavit to validly attest to their accuracy or did not actually read or personally sign the affidavit." *Id.* at 1, 2. This practice became known as "robo-signing"—the term that "describes mortgage servicers' response to the tremendous volume of mortgage defaults and foreclosures after 2007: assembly-line signing and notarizing of affidavits for foreclosure cases, mortgage assignments, note allonges and related documents, all filed in courts and deed recorders in counties across the United States." White, A., *supra* at 469–70.

The robo-signing scandal erupted after an attorney representing a homeowner in a foreclosure action discovered that the documents in the client's file were signed by someone with a title of "limited signing officer." David Streitfeld, *From a Maine House, a National Foreclosure Freeze*, N.Y. Times, Oct. 14, 2010, at A 1, *available at* http://www.nytimes.com/2010/10/15/business/15maine.html. At a deposition, this "limited signing officer" testified that, "as the team lead for the document execution team," his sole "role in the foreclosure process" was "the signing of documents." Oral Deposition of Jeffrey D. Stephan at 20:19–24, *Fed. Nat'l Mortgage Ass'n v. Bradbury*, No. BRI–RE–09–65 (D.Me. Jun. 7, 2010), *available at* http://graphics8.nytimes.com /packages/pdf/business/15mainestephandeposition. pdf. He signed 400 documents a day (10,000 a month), without any personal knowledge of the information contained therein, without reading them, and without a notary present. *Id.* at 45–48, 53–56.

The discovery of such practices at a national lending servicing company had a snowball effect. Even more egregious practices were revealed. There were reports of "tens of thousands of mortgage documents contain[ing] suspect signatures, improper notarizations or [affidavits] signed without a review of the actual paperwork." Aleatra P. Williams, *Foreclosing Foreclosure: Escaping the Yawning Abyss of the Deep Mortgage and Housing Crisis*, 7 Nw. J.L. & Soc. Pol'y 455, 457 n. 8 (2012). One author reported that, "[i]n Florida, the signature and name of 'Linda Green' has appeared on hundreds of thousands of mortgage assignments, with a corporate title of 'Vice President' of at least 14 different companies." Gregg H. Mosson, *Robo-signing Foreclosures: How It Violates Law, Must Be Stopped, and Why Mortgage Law Reform Is Needed to Ensure the Certainty and Values of Real Property*, 40 W. St. U.L.Rev. 31, 38 (2012).

Closer to our home, a paralegal at a Washington, D.C. law firm "has told Maryland state prosecutors that he routinely prepared deeds and foreclosure documents to be signed by law firm partners attesting that attorneys had reviewed the underlining factual basis for them—under penalty of perjury—but in fact these documents were robosigned." *Id.* The Baltimore Sun, likewise, reported that two Maryland law firms that had filed 20,000 foreclosures in Maryland from 2008 through Fall 2010 filed corrective affidavits in every county in Maryland. Jamie Smith Hopkins, *False Signatures Cloud Maryland Foreclosure* Cases, Balt. Sun, Oct. 12, 2010, at A1, *available at* http://articles.baltimoresun.com/2010–10–12/business/bs–bz–foreclosureattorneys–20101012_1_foreclosure-cases-corrective-affidavits-maryland-andflorida-homeowners.

As a result of these discoveries, foreclosure proceedings were stalled and dismissed, investigations of mortgage companies were initiated, lawsuits were filed, and hearings were held, both at the state and federal level.[4] *See* Cong. Oversight

---

4. In July 2011, the Federal Deposit Insurance Commission ("FDIC") reported to Congress "that there were 67 borrower class-action suits pending in 23 states 'challenging foreclosures' based upon alleged robo-

Panel, *November Oversight Report: Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation* 44–46 (2010), *available at* http://cybercemetery.unt.edu/archive/cop/20110402010313/http://cop.senate.gov/documents/cop–111610–report.pdf; Jacob L. White, Comment, *"Robo–Signing": A Symptom of the Shortcomings in Maryland's Policy of* Expediting Foreclosure Proceedings, 1 U. Balt. J. Land & Dev. 81, 82 (2011).

One regulator explained to Congress that these developments have "impaired the health and recovery of the housing and mortgage markets." Helen Mason, *No One Saw It Coming—Again Systemic Risk and State Foreclosure Proceedings: Why A National Uniform Foreclosure Law Is Necessary,* 67 U. Miami L.Rev. 41, 73 (2012) (quotation marks omitted) (quoting Mark Pearce, Director, Division of Depositor & Consumer Protection, Federal Deposit Insurance Corporation ("FDIC")). Similarly, in July 2011, FDIC opined that until the challenges to foreclosures based on robo-signing practices were resolved, they "would create market uncertainty 'discourag[ing] the return of private capital to the mortgage market.'" *Id.* at 74 (alteration in original). As another author explained,

> The facts revealed in the Robo–Sign Scandal raise the specter that it may take years to work through the apparent defects in title of many of the entities claiming to hold mortgages on individual properties and of anyone who has purchased property from such entities. This process will inevitably raise transaction costs associated with proving title to land so that owners can use such property to secure capital and, should they wish, alienate it freely. Such a process can hamper economic development considerably.

signings, defective assignments, and reliance upon MERS." Helen Mason, *No One Saw It Coming—Again Systemic Risk and State Foreclosure Proceedings: Why A National Uniform Foreclosure Law Is Necessary,* 67 U. Miami L.Rev. 41, 74 (2012) (alteration, citation, and quotation marks omitted). There were "also tens of thousands of individual state court foreclosure proceedings where borrowers are asserting a variety of allegations that are forestalling foreclosures." *Id.*

Raymond H. Brescia, *Leverage: State Enforcement Actions in the Wake of the Robo–Sign Scandal,* 64 Me. L.Rev. 17, 22 n. 18 (2011).

It is in this context that Dore's conduct came to light.

### When the Robo–Signer Is an Attorney

The robo-signing practices clearly had an unsettling effect on the economy and homeowners, no matter who engaged in them. But these practices are even more disturbing when a member of the legal profession is involved. *See Attorney Grievance Comm'n v. Vanderlinde,* 364 Md. 376, 415, 773 A.2d 463, 486 (2001) ("Attorneys should be held to higher standards [than members of the general public.]"). As the preamble to our rules of professional conduct makes clear, "as a member of the legal profession," a lawyer is not only "a representative of clients," but he is also "an officer of the legal system and a public citizen having special responsibility for the quality of justice."

Indeed, our entire dispute resolution system depends on the integrity of the participants, who seek the truth through an adversarial presentation of evidence and arguments:

> Our adversary system for the resolution of disputes rests on the unshakable foundation that truth is the object of the system's process which is designed for the purpose of dispensing justice. However, because no one has an exclusive insight into truth, the process depends on the adversarial presentation of evidence, precedent and custom, and argument to reasoned conclusions—all directed with unwavering effort to what, in good faith, is believed to be true on matters material to the disposition. Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process. As soon as the process falters in that respect, the people are then justified in abandoning support for the system in favor of one where honesty is preeminent.

*United States v. Shaffer Equipment Co.,* 11 F.3d 450, 457 (1993); *see also Office of Disciplinary Counsel v. Duffield,* 537 Pa. 485, 644 A.2d 1186, 1193 (1994) ("Truth is the cornerstone

of the judicial system; a license to practice law requires allegiance and fidelity to truth.").

To carry out such a tremendous responsibility, a lawyer's "character must *remain beyond reproach.*" *See Bar Ass'n of Baltimore City v. Siegel,* 275 Md. 521, 528, 340 A.2d 710, 714 (1975) (citation and quotation marks omitted). Authorizing bogus affidavits does violence to this concept and is especially troublesome in light of the high standards to which we have always held attorneys "with respect to honesty and accuracy of the documents they file in court." *Attorney Grievance Comm'n v. Paul,* 423 Md. 268, 295, 31 A.3d 512, 529 (2011) (Adkins, J., dissenting).

It is not surprising that, after the discovery of these egregious affidavit signing practices, courts could no longer take for granted the validity of affidavits filed by attorneys. The revelations have "shaken the confidence that the courts have traditionally given to those kinds of affidavits." Wilner, *supra* at 2. In urging this Court to adopt a new rule and amend the existing rules to prevent this type of conduct from ever taking place again, Judge Wilner, the Chair of the Rules Committee, emphasized that "apart from prejudice to the homeowners," those practices "constitute[ ] an assault on the integrity of the judicial process itself." *Id.*

As the hearing judge pointed out, Dore's "actions contributed to the need for a change in the Rules governing foreclosure actions." It was this very type of irregularity that "motivated Governor O'Malley and members of the Maryland Congressional delegation to seek a halt of foreclosure actions in Maryland." This type of conduct also necessitated this Court's adoption, on an emergency basis, of Rule 14–207.1 and an amendment to Rules 14–207 [5] and 1–311 [6].

---

**5.** Rule 14–207 was amended by deleting section (c), which discussed the screening of filed affidavits by courts, and adding a new section (c) to require service of affidavits, pleadings, and other papers that amend, supplement, or confirm a previously filed affidavit, pleading or paper.

**6.** Rule 1–311 was amended to add the words "or paper" to section (c), to provide: "If a pleading or paper is not signed as required ... or is

The new Rule 14–207.1 specifically sought to address situations such as the filing of bogus affidavits perpetrated by Dore. Paragraph (b) of that rule provides for a show cause hearing, where the affiant and the notary public may be required to testify regarding the contents of the affidavit and the notarizing procedure:

> (2) If the court has reason to believe that an **affidavit filed in the action may be invalid because the affiant has not read or personally signed the affidavit,** because the affiant does not have a sufficient basis to attest to the accuracy of the facts stated in the affidavit, or, if applicable, **because the affiant did not appear before the notary as stated,** the court may order the party to show cause why the affidavit should not be stricken, and, if it is stricken, why the action should not be dismissed or other relief granted.

> (3) As part of the show cause order, **the court may order** that **the affiant and any notary appear** before the court at a time stated in the order for the affiant **to attest under penalty of perjury that the affiant read and personally signed the affidavit and** had a sufficient basis to attest to the accuracy of the facts stated in the affidavit, and, if applicable, for the affiant and the notary to attest that the affiant **appeared before the notary and made the oath stated.** (Emphasis added).

Md. Rule 14–207.1(b)(2)–(3).

That Maryland Rules had to be amended further evidences the magnitude of the negative impact that misconduct such as Dore's has had on the legal profession.[7] Dore's bogus affida-

---

signed with intent to defeat the purpose of this Rule, it may be stricken. . . ." Rule 1–311 also provides that "[f]or a wilful violation of this Rule, an attorney is subject to appropriate disciplinary action."

**7.** For discussion of the impact of the robo-signing scandal in Maryland, see Jamie Smith Hopkins, *False Signatures Cloud Maryland Foreclosure Cases,* Balt. Sun, Oct. 12, 2010, at A1, *available at* http://articles. baltimoresun.com/2010–10–12/business/bs–bz–foreclosureattorneys– 20101012_1_foreclosure–cases–corrective–affidavits-marylandand-

vit practice contributed to the loss of the courts' trust in affidavits filed by attorneys, compromised the integrity of the foreclosure process, and resulted in a substantial expenditure of resources of courts of all levels. This is not to mention the negative effect Dore's conduct had on the particular cases handled by his firm. That the homeowners and mortgage companies in the individual cases were adversely affected goes without saying. The negative impact on the legal profession was great. We find Dore in violation of Rule 8.4(d).

## Sanction For Violations of Rules 3.3(a)(1), 5.3(a)(1) and 8.4(d)

When we impose sanctions, our goal is not "to punish the attorney," but rather "to protect the public and the public's confidence in the legal profession [and] to deter other lawyers from violating the Rules of Professional Conduct." *Attorney Grievance Comm'n v. Taylor,* 405 Md. 697, 720, 955 A.2d 755, 768 (2008) (citation omitted). To achieve this goal, the sanction should be "commensurate with the nature and the gravity of the misconduct and the intent with which it was committed." *Id.* In determining an appropriate sanction, we often refer to the American Bar Association's *Standards for Imposing Lawyer Sanctions,* which focus on "the nature of the ethical duty violated," "the lawyer's mental state," "the extent of the actual or potential injury caused by the lawyer's misconduct," and "any aggravating or mitigating circumstances." *Id.,* 955 A.2d at 768–69 (citation omitted). We

florida-homeowners; Jamie Smith Hopkins, *Maryland Foreclosure Practices Decried,* Balt. Sun, Oct. 13, 2010, available at http://articles. baltimoresun.com/2010–10–13/business//bs–bz–foreclosurecases–20101013_1_halt-foreclosures-foreclosure-documents-foreclosure-cases; Jamie Smith Hopkins & Loraine Mirabella, *Homeowners' Cases Bring Foreclosure Irregularities to Light,* Balt. Sun, Oct. 26, 2010, *available at* http://articles.baltimoresun.com/2010–10–26/business/bs–bz–homeowners–in–foreclosure–20101022_1_foreclosure–documents-foreclosure-lawyer-hundreds-of-foreclosure-cases; Jamie Smith Hopkins, *Maryland's High Court Approves Foreclosure Review,* Balt. Sun, Oct. 19, 2010, *available at* http://articles.baltimoresun.com/2010–10–19/business/bs–bz–court–foreclosurerules–20101 019_1_equivalent-of-court-testimony-foreclosure-practices-thousands-of-foreclosure-cases.

consider these factors in determining the proper sanction here.

## The Factors For Imposing Sanctions

 Dore made false statements to a tribunal (MPRC 3.3(a)), failed to supervise nonlawyer assistants (MPRC 5.3(a)(1)), and engaged in conduct prejudicial to the administration of justice (MPRC 8.4(d)). The hearing court found that Dore had no bad intent because he (1) believed that delegating the affidavit signing function to non-lawyer assistants was permitted by law, and (2) was not aware of his staff's notarization practices. We consider these factual findings established because neither Bar Counsel nor Dore has filed any exceptions. *See* Rule 16–759(b)(2)(A). When we discuss Dore's mental state for the purposes of determining the proper sanction, however, we observe that Dore's explanations for his conduct do not quite add up.

Dore's reliance on *Fisher v. McGuire*, 282 Md. 507, 385 A.2d 211 (1978), to justify his delegation of affidavit signing to his employees was not reasonable. The appellant in *Fisher* sought to invalidate a deed, arguing that the signature on the deed was not the grantor's. *Id.* at 510, 385 A.2d at 212–13. We held that regardless of whether the grantor's signature was a forgery, the deed passed good title because the grantor "adopted the writing on the deed as her signature, by formally acknowledging the instrument to be her act and by delivery of it to the grantees for recording." *Id.* at 512, 385 A.2d at 213.

Conceding that *Fisher* does not permit fake notarizations, Dore maintains that his conduct was innocent because he read *Fisher* to authorize his delegation of affidavit signing to his employees. But, *Fisher* cannot reasonably be read for the proposition that it is a legitimate practice to have someone else sign affidavits to be filed in court. Whether one can adopt the signature of another is not analogous to whether one makes a false statement by filing a bogus affidavit in court. In any event, here, because Dore did not review the executed documents before they were filed, the only lawyers who could

be said to have adopted Dore's signature were other lawyers in his firm who reviewed the completed documents—patently an untenable "adoption" even under a generous reading of *Fisher.*

The other justification offered by Dore for the signature delegation does not hold water either. The hearing court explained it as follows: "the Deed of Substitution of Trustees for the Deed of Trust states that any one of the substituted trustees can act for the other. Mr. Dore interpreted this to mean that the other Substitute Trustees can sign the name of another Substitute Trustee." The hearing court observed, however, that Dore "acknowledged that he authorized two non-lawyer employees, who were not substitute trustees, to sign his name to the affidavits." Thus, Dore's argument about the Substitute Trustees is of no help to him.

With such incongruous explanations for why he thought his signature delegation was permitted by law, we find that Dore's conduct "was at least grossly negligent." [8] *See Glenn,* 341 Md. at 487, 671 A.2d at 482.

As for the next factor under the ABA guidelines—"the extent of the actual or potential injury caused by the lawyer's misconduct," the hearing judge found that Dore's clients "have suffered delays in the foreclosure process, [but they] appreciated that he immediately advised them of the problem and took complete responsibility." Clients' injury is a consideration, but in these circumstances may be of less importance in light of the public impact. As we discussed above, the injury to the public in general was great, both in terms of the negative image accorded the profession as a whole and the more tangible effect on the courts' day-to-day operations.

Finally, we look to the possible mitigating factors. Under the ABA standards, mitigating factors include:

---

**8.** There are "graduated levels of culpability, with the most culpable mental state that of intent, the next most culpable mental state that of knowledge, and the least culpable mental state that of negligence." *Attorney Grievance Comm'n v. Glenn,* 341 Md. 448, 485, 671 A.2d 463, 481 (1996) (citing ABA Standards, Standard 3.0 cmt., at 300).

"Absence of a prior disciplinary record; absence of a dishonest or selfish motive; personal or emotional problems; timely good faith efforts to make restitution or to rectify consequences of misconduct; full and free disclosure to disciplinary board or cooperative attitude toward proceedings; inexperience in the practice of law; character or reputation; physical or mental disability or impairment; delay in disciplinary proceedings; interim rehabilitation; imposition of other penalties or sanctions; remorse; and finally, remoteness of prior offenses."

*Taylor*, 405 Md. at 720, 955 A.2d at 768–69 (quoting *Glenn*, 341 Md. at 488, 671 A.2d at 483).

Many mitigating circumstances exist in this case. The hearing court emphasized the absence of a prior disciplinary record in the twenty-four years that Dore has been in practice; the absence of a dishonest or selfish motive; and that Dore made timely good-faith efforts to make restitution or to rectify consequences of misconduct. Importantly, "[n]o inaccuracies had been cited or found in any of the Affidavits filed in the foreclosure actions by [Dore's] firm."

The hearing court also found that the severity of Dore's violations was mitigated by the full disclosure he made to the disciplinary board and his cooperation and participation in the disciplinary proceeding. In fact, the hearing court noted that Dore "has taken full responsibility for the misconduct and never denied that it was improper," and the level of Dore's "cooperation and participation in the disciplinary proceeding is precisely how a lawyer should behave in these situations." Other mitigating factors included Dore's "good character and reputation in the community" and his deep remorse for what he has done. Finally, the hearing court found "that the significant press coverage of the issue and the considerable time and effort that [Dore] and his firm have spent correcting the problem mitigate his misconduct in this matter."

### Comparing Dore's Conduct to Prior Cases

With these findings in mind, we turn to our prior cases with similar violations and circumstances. Bar Counsel asks us to

suspend Dore indefinitely from the practice of law with the right to reapply for reinstatement after 60 days. It argues this is a suitable sanction citing two cases involving signing irregularities and two cases involving a failure to supervise staff. *See Ward*, 394 Md. at 37–39, 904 A.2d at 499–500 (a 60–day suspension for violating Rules 1.1, 1.3, 1.4, 1.5, 5.3(a), and 8.4(d) by engaging in conduct, which included directing a secretary to notarize a power of attorney when the signer was not present); *Attorney Grievance Comm'n v. Parsons*, 310 Md. 132, 143, 527 A.2d 325, 330 (1987) (90–day suspension for "falsely signing a client's name to the divorce complaint and having it notarized and filed with the court" and neglecting a client's case); *Glenn*, 341 Md. at 491, 671 A.2d at 484 (indefinite suspension for failing to supervise bookkeeping staff, resulting in trust account violations and misappropriation of client funds); *Attorney Grievance Comm'n v. Kimmel*, 405 Md. 647, 689, 955 A.2d 269, 294 (2008) (90–day suspension for failure to supervise an associate handling a high volume of cases with inadequate support).

Dore argues dismissal with a warning is the appropriate sanction.[9] He relies on *Attorney Grievance Commission v. Paul*, in which we ordered a reprimand for falsifying a signature on a stipulation of dismissal filed in court. 423 Md. at 274, 293, 31 A.3d at 516, 527. Dore attempts to distinguish this case from *Paul*, arguing that even the reprimand ordered in *Paul* would be too severe in this case. He maintains that,

Unlike *Paul*, where the respondent intentionally falsified a document filed with the Court by affixing another attorney's signature without her permission, Mr. Dore did not falsify any documents. The gravamen of [Dore's] misconduct . . . rests upon [his] direction to his employees for his name to appear on the signature block on all documents filed with the Court in foreclosure cases throughout the State of Maryland, including affidavits, and for non-lawyers to sign his name thereto.

---

**9.** At oral argument, Dore's counsel stated that "at worst," this Court should order a reprimand.

The only similarity between *Paul* and this case is that both cases involved fake signatures. The violations, however, are of a different nature. The attorney in *Paul* falsified one signature—the opposing counsel's signature—on a stipulation of dismissal. 423 Md. at 274, 31 A.3d at 516. The two attorneys first discussed dismissing the suit verbally, after which the opposing counsel agreed to filing a stipulation of dismissal and accepted the respondent's offer of drafting the same. *Id.* at 273, 31 A.3d at 515. The respondent drafted the stipulation and forwarded it to the opposing counsel, who then modified the format of the stipulation, adding parties to the certificate of service, signed it, and sent it back to the respondent. *Id.* at 273–74, 31 A.3d at 515–16. Instead of filing the modified draft, however, the respondent cut the opposing counsel's signatures from the modified draft, and pasted them into the original version, using a copier. *Id.* at 274, 31 A.3d at 516.

The present case does not involve one document or one signature. This was a systemic failure: there were hundreds, if not thousands, of bogus affidavits and signatures, prepared over a period of approximately two years.[10] And, as we discussed above, Dore's actions contributed to severe detrimental effect on the image of the legal profession in general and caused a significant waste of judicial resources. Without minimizing the gravity of the attorney's actions in *Paul,* we note that the opposing counsel in that case had agreed to the contents of the stipulation. *Id.* In fact, the stipulation did not even need to be refiled after the falsified signature was discovered. *Id.* In contrast, in this case, circuit courts in five counties and Baltimore City had to hold hearings to determine the validity of Dore's filings, and supplemental affidavits also had to be filed. Because of these differences between the two cases, *Paul* does not provide helpful guidance in fashioning the appropriate sanction for Dore.

---

**10.** The hearing court found that "[a]t its peak, the monthly volume of foreclosure files received was 1,000–1,200 per month," and that "[t]here are now approximately sixteen (16) affidavits which must be filed in every foreclosure action."

Dore's other argument, in an attempt to minimize the consequences of his actions, is likewise unpersuasive. Dore insists that he did not know his employees were notarizing the affidavits: "Unbeknownst to [Dore], however, was that his employees affixed notary jurats to these documents attesting that [Dore] appeared before the Notary Public and either signed the document or affirmed the signature to be his own." He attempts to rationalize his failure to supervise his employees as follows:

From time to time, all of us who have been or are privileged to practice law need to review or proof read our work before it is submitted for filing. It is not at all uncommon or unusual to 'skip the boilerplate,' the caption, the salutation, the certification of service, particularly when we are all relatively comfortable in the thought that given the often repetitive nature of our filings, those items are correct.

These justifications find no sympathy with this Court. The high volume of Dore's foreclosure filings required more diligence from him, not less. That Dore has gotten "relatively comfortable" with foreclosure filings, given their "repetitive nature," does not excuse the mass delegation of affidavit signing to employees or Dore's failure to realize that those affidavits were also notarized. We expect more from an attorney who has concentrated his practice in foreclosure cases for more than a decade.

Contrary to what Dore seeks, in cases involving multiple violations of the same kind, a reprimand has been considered insufficient. *See Attorney Grievance Comm'n v. Granger,* 374 Md. 438, 460, 823 A.2d 611, 624 (2003) ("Given the nature and quantity of respondent's violations, his recommendation of a public reprimand is inherently inappropriate."). Cases not limited to a single violation or to one client—even when the attorney's conduct is unintentional—call for a more severe sanction, such as suspension. *See, e.g., Ward,* 394 Md. at 39, 904 A.2d at 499–500 ("A reprimand ... would be too lenient a sanction because Respondent's violations are neither limited to a single rule violation nor to one client."); *see also, e.g., Attorney Grievance Comm'n v. Brown,* 415 Md. 269, 281–82,

999 A.2d 1040, 1047–48 (2010) (ordering 90–day suspension when attorney's conduct "did not grow out of a single act of dishonesty, but rather are based on three separate instances of deliberate deceit"); *Attorney Grievance Comm'n v. Brown,* 353 Md. 271, 296, 725 A.2d 1069, 1081 (1999) (issuing an indefinite suspension with the right to reapply in one year while noting that "[t]he number of complaints before this Court are of great concern").

For instance, in *Attorney Grievance Commission v. Goldberg,* Bar Counsel charged respondent with "sixteen instances of professional misconduct which essentially involved neglect." 292 Md. 650, 651, 441 A.2d 338, 339 (1982). These violations amounted to incompetent representation and a failure to supervise a nonlawyer employee. *Id.* at 651–52, 441 A.2d at 339. The respondent delegated many tasks to his secretary, including preparing and filing of court documents. But, as it turned out later, she failed at those tasks, and "would remove the files and not calendar them, preventing the lack of progress on those files from coming to the attention of" the respondent. *Id.* at 652, 441 A.2d at 339. There was no evidence that the respondent was aware of any of his secretary's activities, and, when he became aware of what had occurred, the respondent took immediate action to rectify the situation as much as possible. *Id.* He also had no disciplinary record and "has been regarded as a competent attorney." *Id.* at 658, 441 A.2d at 342. The respondent thus argued no sanction was warranted. *Id.* We ordered a thirty-day suspension, stating:

We understand the difficulties of a busy solo practitioner, which is what Goldberg was during most of this time. We also understand that one cannot watch every single thing which takes place in his office. It would appear here, however, that Goldberg just did not adequately supervise his employee. He is fortunate, under the circumstances, that there appears to have been no actual loss to his clients by virtue of the negative balances in his escrow account.

Nonetheless, the public must be protected. Lawyers must be impressed with the fact that at all times they have

a responsibility to their clients. This responsibility necessarily includes adequate supervision of their employees. *Id.*

We also ordered a suspension in *Attorney Grievance Commission v. Kimmel*, another failure to supervise case. 405 Md. 647, 955 A.2d 269. In *Kimmel*, two partners with their primary office in Pennsylvania, opened an office in Maryland, hired an attorney with no litigation experience, gave her a high case load, but no clerical or paralegal support, and demanded a profitable performance. The overwhelmed associate eventually began missing deadlines and ignoring discovery requests and motions compelling discovery, which actions resulted in a dismissal of forty-seven of the firm's clients' cases. *Id.* at 653–61, 955 A.2d at 273–78. We explained that "Respondents failed to design and implement policies and procedures that reasonably would ensure compliance with the Maryland Rules under the specific circumstances of this case," and suspended them indefinitely from practice in Maryland with the right to apply for reinstatement no sooner than 90 days of the order. *Id.* at 680, 689, 955 A.2d at 289, 294.

Bar Counsel also directs our attention to cases involving improper signatures. In one such case, *Ward*, the attorney violated several rules of professional conduct in his representation of two clients, including Rules 5.3(a) and 8.4 in connection with the notarization of a power of attorney. 394 Md. at 9–10, 28, 904 A.2d at 482–83, 494. Although the attorney did not specifically instruct the secretary to notarize the incarcerated client's signature outside of his presence, he knew the signature was not notarized at first but later became notarized. *Id.* at 30, 904 A.2d at 494. We found that these actions "reflected negatively on the administration of justice and the Bar." *Id.* at 38, 904 A.2d at 499. Taking into consideration the mitigating factors,[11] however, we ordered an indefinite suspen-

---

11. We noted that the "Respondent's misconduct was the result of inexperience, incompetency, and an inability to balance his work schedule." Further, we considered as a mitigating factor Respondent's efforts to repay the client "for the default judgment entered against him

sion with the right to apply for reinstatement after 60 days. *Id.* at 39, 904 A.2d at 500.

Also analogous to this case, in terms of the number of signatures and the procedures in place at the firm, is the case of reciprocal discipline from Georgia—*In re Hutt,* —— Ga. ——, 728 S.E.2d 181 (2012). The attorney in that case was "a junior associate with a high-volume civil litigation firm in Jacksonville, Florida," who "was assigned to work primarily on foreclosure cases." *Id.* at 182. It was the "firm's customary practice to file an affidavit of attorney fees at the summary judgment stage." *Id.* These "affidavits were usually very similar, if not identical, with only the captions and dates changed. The purported affiant on the fee affidavits was 'Attorney X,' whom the firm had hired to train junior associates. Attorney X also reviewed foreclosure files on a few occasions." *Id.* The junior attorney was told "that Attorney X had given the firm permission to sign his name on attorney fee affidavits in his absence" and that "signing Attorney X's name on the fee affidavits was common practice in the office." *Id.* So that was what the junior associate did, until a judge "recognized the signature on the fee affidavits as a forgery and brought the matter to the attention of the Florida Bar." *Id.* at 183. The junior attorney was suspended from practice in Florida for forty-five days and accepted a reciprocal suspension in Georgia for the same length of time. *Id.* at 182; *see also Iowa Supreme Court Attorney Disciplinary Bd. v. Palmer,* 825 N.W.2d 322 (Iowa 2013) (attorney's false notarization of documents, and his failure to disclose to court that signatures of his client thereon were not authentic warranted a 30–day suspension).

Admittedly, none of these cases or any decided case, for that matter, is directly on point here. These cases do illustrate, however, that systemic violations, involving more than

---

as well as refunding his retainer fee." We also observed that Respondent had "no history of prior disciplinary offenses," and his "misdeeds did not rise to the level of a misappropriation of client funds or intentional dishonesty." *Attorney Grievance Comm'n v. Ward,* 394 Md. 1, 37–38, 904 A.2d 477, 499 (2006).

one client or more than one instance of misconduct, as well as misconduct that involves false signatures, are serious business. Dore—a partner and a major stockholder at his firm—filed documents in court, in which he "solemnly affirm[ed] under the penalties of perjury" the truthfulness of certain facts pertaining to foreclosing on someone's home. Some of those documents bore notary attestations, certifying that Thomas P. Dore appeared before the notary and "made oath that the facts in the foregoing [document] were true, to the best of his knowledge, information and belief." Those statements were not true. In actuality, although "a lawyer" reviewed these affidavits, Dore himself did not read many of them, did not sign them, and did not appear before any notary or make any oath.

The extent of Dore's violations and their ramifications is so great that "more than a slap on the wrist" is necessary to send the message to the legal community and the public at large that this Court has no tolerance for this type of conduct, and to restore the public's trust in the legal profession. We hold that a 90–day suspension would accomplish that goal. We refrain from an indefinite suspension only because of the many mitigating circumstances. The suspension shall commence thirty (30) days after the filing of this Opinion.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761. JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST THOMAS PATRICK DORE IN THE SUM OF THESE COSTS.**

Chief Judge BELL would have imposed a reprimand only.