ADKINS, J.,
Concurring and Dissenting, in which McDonald, j., joins.
I write separately not only because I disagree with the holding and sanction in this case, but, as I explain below, because the Majority opinion has worrisome implications for *676 legal practitioners. I disagree with the Majority’s conclusion that Respondent violated MLRPC 1.4 and 8.4(d). I am doubtful that she violated MLRPC 1.1. Furthermore, although I agree with the Majority’s conclusion that Respondent violated MLRPC 1.3, 7.1, 8.4(a) and 8.4(c), I disagree with the severity of the violations, and consequently, the appropriate sanction.
It is important that we evaluate the conduct in this case in context. As the hearing judge said:
The Court does find that this is not a case of fraud. The Respondent did not set about, in her conduct and actions, with the intention of defrauding her clients. The Court finds this to be a case where a young attorney made mistakes and misrepresentations for the purpose of gaining employment.
A significant aspect of the Majority opinion with which I disagree stems from its recurring theme expressed as follows: “we have no difficulty in concluding that Narasimhan, not Rogers, was responsible for representing the MPD. As such, Narasimhan was required, under the MLRPC, to provide competent representation utilizing ‘the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.’ ” Maj. Op. at 653-54, 92 A.3d at 521. (Emphasis added). The Majority relied on this assessment several times to justify its conclusions about several of the Rules that were violated, and the proper sanction. Yet, the hearing judge did not find this. Rather, he found that they “were hired based on Mr. Rogers’ expertise and the Respondent’s ability to provide local service as a Maryland Bar member.”
Indeed, the facts, when examined, do not support the Majority’s thesis.[1] The client’s understanding was expressed by *677 MPD Director of Human Resources Haines, who agreed that MPD “hired the Immigration Law Group based upon Mr. Rogers’s expertise, not that of Ms. Narasimhan[.]” A lawyer herself, Haines knew Respondent had “less than three months of immigration practice experience.” She confirmed that the MPD “could not have moved forward” without Rogers and “felt comfortable that he would meet our need and so we selected him.” Director Haines was convinced from the beginning that Respondent “alone [lacked] sufficient experience to do this.” She confirmed that Rogers would serve as “lead counsel” and Narasimhan would be a “local liaison” or “go-between between ourselves and Mr. Rogers.” She understood that Respondent would be “in constant contact with Mr. Rogers[,]” and that “he would look at everything before she sent it to us and that he ... would basically be directing her— directing her activities.”[2]
Consistent with the MPD’s understanding, Rogers was on the phone during the December 10, 2009 conference call, and Respondent was absent because of a planned trip outside the country.[3] Haines also recalled that there were “a few emails *678 back and forth” between Respondent and MPD during that trip. Haines also agreed that Respondent appeared “to be dedicated to customer service[.]” When asked about difficulties in communicating with Respondent, Haines replied,
The only real problem that we had was, when there was a need for us all to talk together, it was very difficult getting the parties together, either because of conflicts that Mr. Rogers had or conflicts that Sudha[4] had, but it was — on at least two occasions where it was important for us to meet quickly, it took more than a few days to get it done. That’s the only thing I, personally, was aware of.
Haines amplified by explaining that “trying to get them together for a conference phone call was problematic, ... there was a lot of interaction between Dr. Samuel and Sudha, and I didn’t perceive that there was any problem when they were actually interacting with each other.”
A primary defense offered by Respondent, especially to the incompetency charge, was that, although she alone did not have sufficient knowledge and experience to undertake the legal immigration work necessary to secure a permanent residence for Dr. Samuel, she only undertook the work in conjunction with her partner, Rogers, who, she believed, had 16 years of experience in immigration law. The Majority rejects Respondent’s defense saying:
Although an attorney can provide competent representation through association with an attorney “of established competence in the field in question[,]” MLRPC 1.1 cmt. [2], such was not the case here. To begin, setting aside any issue as to Narasimhan’s competence, or lack thereof, as the hearing judge concluded, Narasimhan failed to ascertain whether Rogers was, in fact, competent in the field of immigration law.
*679 Maj. Op. at 652, 92 A.3d at 520. The Majority opines that Respondent should have examined Rogers’s qualifications and expertise by checking with some third party, and that verifying his Bar membership, as she did, was not sufficient.[5] Maj. Op. at 686-88, 92 A.3d at 540-41. In my view, this sets up an unduly harsh standard for young attorneys who seek jobs. I know of no registry or procedure, other than verifying that Bar membership is in good standing, to determine what expertise an attorney possesses.[6] If an attorney seeking a job has a sophisticated knowledge of the field of practice, she might telephone other practitioners to ask about the lawyer in question. But a person fresh out of law school, who may not know many attorneys, let alone attorneys who specialize in a given field, just does not have access to this information. When an older lawyer offers her a job, tells her of his experience, and she verifies his status as a member of the Bar, a younger lawyer should not be disciplined for failure to ascertain some more precise method for objective measurement of his expertise. Respondent’s actions in associating with Rogers to undertake an immigration practice may have been naive, but they were not unethical.
To hold that Respondent was expected to be able to complete the legal work necessary to obtain a Green Card for Dr. Samuel on her own, without guidance from Rogers, is an extremely unfair application of the MLRPC. Under these circumstances, Respondent should only be held to the standard of a novice attorney, working under the supervision of an attorney experienced in the field. The Majority’s refusal to acknowledge Respondent’s status as a novice attorney in an apprentice-like relationship with Rogers is pertinent to more *680 than one of the alleged instances of misconduct. I address the particulars below.
MLRPC 7.1 (Communications Concerning a Lawyer’s Services)
I agree that Respondent made minor misrepresentations about her experience in the resume she submitted to the Metropolitan Police Department (MPD), thereby violating MLRPC 7.1 and 8.4(c). Although she truthfully told the MPD that she had less than three months as a practitioner in the field, and did not purport to be qualified to handle the MPD work for Dr. Samuel on her own, she did exaggerate slightly the specifics of her experience. This is a violation for which some discipline is appropriate. As I indicated earlier, neither Respondent nor the client, MPD, considered her experience to be material in the decision to hire the Immigration Law Group (“ILG”) for the immigration law work at hand, a factor to which we should accord significant weight.
MLRPC 1.1 (Competence)
On March 24, 2010, Respondent filed the Employer’s Application for Permanent Employment Certification for the position of “Project Specialist,” known as Form 9089. This, apparently, is the first step required to obtain a Green Card. On May 3, 2010, the Department of Labor, Office of Foreign Labor Certification (DOL) denied the certification, indicating that the Form 9089 was incomplete in that it failed to provide information known as the Prevailing Wage Determination, among other things. Clearly, this filing contained significant errors by both Rogers and Respondent, who worked on the filing together. Petitioner’s expert, an immigration practitioner, expounded at length about Respondent’s lack of expertise, and failure to meet the standard of care, testimony that was accepted generally by the hearing judge.[7]
*681 Yet, Respondent promptly made efforts to correct her error and, under the guidance of Rogers, secured a new Prevailing Wage Determination from the appropriate division of the DOL, and filed a more complete form within less than 30 days. As acknowledged in the DOL’s November 15, 2011 ruling,[8] the deficiencies were all completed in this second submittal. Despite this compliance, the DOL again denied the labor certification, on grounds that 20 C.F.R. 656.17(a) provided that “[incomplete applications will be denied.” DOL explained: “PERM is an exacting process, designed to eliminate back- and-forth between applicants and the government, and to favor administrative efficiency over dialogue in order to better serve the public interest overall, given the resources available to administer the program.”
Respondent, was, without doubt, “in over her head” in trying to take the appropriate steps to secure permanent residence status for Dr. Samuel. But, in bidding for and undertaking the work, she did so in reliance on Rogers’s 16 years of experience, and her work was under his guidance.[9] She admitted sending an incomplete version of Form 9089 by mistake when she had at her fingertips a more complete version. This proved to be a significant error because, as its denial memo said, the DOL policy is to reject filings that are incomplete, without allowing amendment. Petitioner’s expert also delineated other errors, although the evidence does not reveal whether these were entered into the computer by Rogers or Respondent, as both made entries on the form. Both Respondent’s testimony and e-mail exhibits show that *682 both filings of Form 9089 were read and approved by Rogers. Rogers did not testify, and the record does not reveal whether he was charged with any violations in Arkansas or any reciprocal discipline here. With the Majority opinion as written, I fear the implications of holding young lawyers accountable, in the disciplinary context,[10] for the negligence or inattention of more experienced lawyers who supervise them. It can be efficient — benefiting both the client and the law firm — for an inexperienced lawyer to act in an apprenticeship role, handling certain details of a matter, including regular client contact. Moreover, in many instances, a client, like MPD here, is fully aware that the inexperienced lawyer will not provide the expertise and judgment expected of the more experienced lawyer. If young attorneys, working in a firm, become reticent to interact freely and openly with clients, the long tradition of apprenticeship as an entryway to our profession will suffer. I worry that the Majority opinion imperils the viability of this time-honored method of beginning a legal career.
As the Preamble to the MLRPC says, and many of our decisions reflect, “the Rules presuppose that whether or not discipline should be imposed for a violation, and the severity of a sanction, depend on all the circumstances, such as the willfulness and seriousness of the violation, extenuating factors and whether there have been previous violations.” MLRPC, Preamble: A Lawyer’s Responsibilities [19]. In deciding this case, we should bear in mind that “ ‘mistakes are the inevitable lot of mankind’ ” Baranski v. Serhant, 106 F.R.D. 247, 250 (N.D.Ill.1985) (quoting Re Taylor’s Estate, 22 Ch. D. 495, 508 (1882)), and lawyers are not immune.
Whether we ultimately decide to grant Respondent’s exception to the finding that she violated MLRPC 1.1 is a close call. Clearly, the denial of the labor certification was caused, at least in part by Respondent’s failure to pay attention to details at a time when details were terribly significant. I have no *683 doubt that she regrets this and has learned from this mistake. Under these circumstances, even if she violated MLRPC 1.1, such violation, by itself, would justify no more than a reprimand.
MLRPC 1.4 (Communication)
Respondent’s alleged failure to communicate is a major issue used by the Majority to justify Respondent’s discipline. As I understand the evidence, Respondent’s alleged failures to communicate with the client consisted of (1) the failure to set up a second conference call with Rogers and MPD in December 2009, when Respondent was on a planned trip to India that the client knew of from the beginning of the representation; (2) the failure to cause Rogers to provide substantive information about the immigration process in response to an April 15, 2010 e-mail; (3) the failure to advise MPD regarding how to secure a one-year extension for Dr. Samuel in May or June, 2010, and (4) the failure to set up a conference call with the client and Rogers for a 6-day period in July.
The Majority says that “there were multiple occasions on which Narasimhan failed to respond at all to requests for information, and she also failed to provide a requested status update.” Maj. Op. at 655, 92 A.3d at 522. See also, Maj. Op. at 661-62, 92 A.3d at 525 (“It is readily apparent, however, that on many occasions Narasimhan failed to promptly respond to communications from the MPD, to keep the MPD reasonably informed about the status of the case, and to provide information necessary____”); Maj. Op. at 669, 92 A.3d at 530 (Respondent “failed on numerous occasions to respond promptly and adequately to requests for information.”). With due respect to the Majority, I submit that the record does not support these characterizations. To explicate my position, unfortunately, I must delve into some detail.
(i) December Conference Call
Rogers conducted an initial telephone conference call with Haines and Dr. Samuel on December 10, 2009, in which he outlined the process for securing permanent resident status. *684 As the e-mails in the record reveal, during this call, Rogers set up the plans for the December 21, 2009 conference call. Respondent was in India and there is no indication that Respondent was asked to facilitate that second call in any way. If Rogers did not follow through and have this call, it is decidedly unfair to blame Respondent. This was not a violation of MLRPC 1.4.
(ii) Communications in April
If there was any failure by Respondent to keep the client reasonably informed about the status of the matter, it was minor. The record is rife with e-mails from Respondent to Haines and Dr. Samuel.[11] Although Dr. Samuel testified that she asked questions of Rogers and Respondent in an April 15 e-mail, and received no response until April 27, the record reveals that Respondent replied on April 18, that “Gordon will respond with all the answers.”[12] When Respondent’s counsel brought her attention to this reply, Dr. Samuel responded: “I did not receive immediate answers, so just telling me that somebody is going to respond and then receiving the answers to the question 12, 13, 14 — even five days later — is just unreasonable to me[.]” Dr. Samuel evidently did not accept what her superior, Haines, negotiated as the terms of the representation: that it was understood that Rogers had the immigration expertise, that Respondent did not, but would provide local assistance, gather information, speak with the *685 client, and assist Rogers in preparing the necessary filings. There was no evidence that Respondent had any power to control Rogers’s schedule, or guarantee his responsiveness, and MPD had no reason to expect that she did.
(iii) Communications After Initial Denial By DOL. (May-July)
May. The labor certification sought by the original submission of Form 9089 was denied by the DOL on May 3, 2010, on grounds it was incomplete. Dr. Samuel complained in her testimony that, thereafter, she had some difficulty arranging a face-to-face meeting with Respondent on or around May 8, and they did not actually meet until May 27. Dr. Samuel explained: “[I]t was something I wanted to do more so, closer to when we received the denial, but — you know, [Respondent’s] schedule just never seemed to be open enough for her to meet with me[.]”[13] The written e-mails during this period provide specific evidence of communications which negate the general complaint that Dr. Samuel made. In a May 7 e-mail, Dr. Samuel asked Respondent to “address the missing information and make the necessary corrections,” and Respondent replied the same day, indicating they were to speak at 2:00 p.m. the next day. Apparently, a face-to-face meeting did not take place, but Haines verified that a conference call with Rogers, Respondent, Haines and Dr. Samuel occurred on Saturday, May 8, in which that issue was discussed. During this call, they talked about the options of refiling or appealing. Rogers guided the client as to these options, and MPD decided to resubmit a revised Form 9089 to the DOL.
Respondent responded quickly to resubmit the form. She e-mailed Rogers on May 8, asking him to fill out “the Ml section” and “the F section of the 9089 form.” From May 8-27, Rogers and Respondent were working on completing a revised Form 9089. In a May 12 e-mail, Respondent sent *686 Rogers certain information needed to “re-fill the 9089 form,” making comments and asking questions about aspects of the form. Rogers completed the form, and in a May 16 e-mail to Dr. Samuel and Haines, asked for “a little more information” that he thought would be helpful to include. Respondent, meanwhile, spoke to two government agencies about securing the necessary “[prevailing wage information,” reporting to Rogers in a May 20 e-mail.
Importantly, Dr. Samuel was aware of the work being done — between May 14 and May 25 there were several e-mails between Rogers and Dr. Samuel regarding details of the revised Form 9089. After talking with Dr. Samuel on May 26 to arrange a meeting to sign the revised document, Respondent e-mailed Dr. Samuel and Haines, indicating: “we are on for tomorrow May 27th at 9:30 am.” Respondent sent the revised Form 9089 by Federal Express to the DOL on May 27.
In sum, regarding May, 2010, after a four-way conference call on May 8, Rogers was communicating with Dr. Samuel about the revisions to Form 9089 that he and Respondent were making to correct the deficiencies of the original filing. Certainly Respondent was not obligated to communicate with Dr. Samuel when Rogers was already doing so.
June. On June 8, Respondent faxed a follow-up letter to the DOL requesting relief from the “Final Determination Denial” of the Form 9089. On June 14, she told Rogers that she was also working on completion of Form 1-140, known as “Petition for Immigrant Worker,” which she would send for his review and approval. She included a link from the DOL website indicating “[a]n 1-140 petition is the second step in the Green Card process” after the “Labor Certificate is approved[J”[14]
*687 On June 17, 2010, the Office of Foreign Labor Certification e-mailed Respondent notice that it had issued a “prevailing wage determination for the position of Project Specialist” and on June 21, Respondent informed the DOL office reviewing Form 9089 of this receipt. As indicated above, this determination proved to be fruitless, as the DOL would later, in November, reject the Form 9089 labor certification request, even though the requisite information was provided, on grounds it was not complete when first filed.
July — MPD’s Termination. In a July 14 e-mail, Dr. Samuel requested a meeting with Rogers for July 16. On the same day, Respondent replied, indicating that Rogers was in Panama and she would “have to see if [Rogers] is available to talk this Friday.” In that e-mail, she also advised that she and Rogers were “working on your 1-140 and 1-485 application.” Respondent followed up the next day with another e-mail advising Dr. Samuel that Rogers, after checking his schedule, could not fit in a conference call that Friday, but could do so the following week.[15] It was six days later, on Tuesday, July 20, that Haines sent an e-mail terminating the MPD’s attorney-client relationship with ILG, and asking ILG to send a final bill.
(iv) Conclusion Re: MLRPC 1.4
Rejecting a key defense offered by Respondent that, in light of her limited experience, her role was to play the assistant to *688 Rogers, the Majority says: “As to Narasimhan’s claim that she responded by facilitating communication with Rogers, Narasimhan accepted primary responsibility for representing the MPD; as such, it was incumbent upon Narasimhan to provide the requested information herself or to ensure that Rogers responded in full.” Maj. Op. at 655, 92 A.3d at 522. As I said before, the hearing judge did not reject or otherwise address this defense. I submit that the evidence does not support the Majority’s treatment.
Dr. Samuel, without the testimonial support of her superior, Haines, made a general complaint against Respondent about supposed failures to communicate. Yet, as my discussion above demonstrates, neither Dr. Samuel nor the hearing judge, provided enough specific information for us to conclude Respondent violated MLRPC 1.4 by delaying in providing replies to requests for service. Lawyers cannot always provide legal advice as fast as their clients would like, especially since answers to many questions require research, thought and judgment. In our role overseeing the discipline of lawyers for ethical violations, we should be careful to fully understand the context of the alleged delay, and discipline only for those delays that qualify as neglect of duty.
In light of Respondent’s diligent efforts to communicate overall, and the evidence of the work performed and communications, I submit that Dr. Samuel’s general testimony, such as “[Respondent’s] schedule just never seemed to be open enough for her to meet with me ...” is not sufficiently specific to provide clear and convincing evidence that Respondent violated MLRPC 1.4.[16] Neither Dr. Samuel nor the hearing judge said anything more specific than that. It is my strong opinion that the generalities of both Dr. Samuel and the *689 hearing judge on this topic do not rise to the level of specific delays that would justify our finding that there exists clear and convincing evidence of a failure to communicate. Conclusory testimony does not become clear and convincing evidence simply because a hearing judge deems it so.
MLRPC 8.4(d)
Finally, I do not agree that Respondent violated MLRPC 8.4(d). This Rule should be reserved for more serious violations than have been demonstrated here. The Majority relies on our opinion in Att’y Grievance Comm’n v. Dore, 433 Md. 685, 707-08, 73 A.3d 161, 174 (2013) as analogous support for finding a violation of MLRPC 8.4(c) and supporting an indefinite suspension with the right to reapply after 60 days, reasoning that both cases involved dishonesty and misrepresentation without any intent to deceive. In the Majority’s view, “Narasimhan’s lack of competence in representing MPD reflected negatively on attorneys and the legal profession, and as a consequence, had the effect of eroding public confidence in the legal profession.” Maj. Op. at 669, 92 A.3d at 530. I see a fundamental distinction between the two cases. In Dare, we dealt with an experienced attorney who authorized hundreds of false statements made to multiple courts involving hundreds of foreclosure actions all over Maryland. 433 Md. at 722, 73 A.3d at 183. That case involved an entire system of misrepresentation that required new court proceedings in multiple counties to correct the problem. Id. I agreed that the attorney’s actions in Dore constituted conduct prejudicial to the administration of justice in violation of MLRPC 8.4(d) because of the magnitude of the filings in question, the involvement of the courts, and the attendant publicity. I do not see the events here as remotely comparable. We should not transform every act of negligence by an attorney into a violation of MLRPC 8.4(d).
Conclusion
The exacting approach exemplified by the Majority’s opinion will not further the principles motivating our adoption of the *690 MLRPC. Rather, it will only serve to amplify the anxiety an attorney suffers when faced with the complexities of modern practice. Under all of the circumstances, including her misrepresentation about her prior experience, and even if we find a violation of MLRPC 1.1,1 think a flat suspension for 15 days is fully sufficient sanction for Ms. Narasimhan.
Judge McDONALD authorizes me to state that he joins in this concurring and dissenting opinion.

. This understanding is consistent with the Joint Venture Agreement between Narasimhan and Rogers, which clearly set forth that Rogers was lead counsel. In its words,
The Parties hereby acknowledge that [Rogers] has the experience, legal knowledge and, the business acumen in the Joint Venture. [Rogers] shall be primarily responsible for providing advice and legal expertise to the Joint Venture. [He] shall also be primarily *677 responsible for research of legal issues that will arise in the conduct of the law practice within the Joint Venture.
Joint Venture Agreement 5.01 (Division of Labor) (Emphasis added).

. Dr. Samuel did not participate in the hiring of ILG. She expressed the opinion that Respondent was “their lawyer” but, when asked, had no particular basis for this opinion.

. MPD issued the procurement contract for legal services provided by ILG on November 20, 2009. Respondent had scheduled a trip to India between December 3, 2009 and January 17, 2010, and informed Haines of this right after the bid was awarded. Designating Respondent’s trip to India as a failure to communicate, when Rogers, the recognized senior partner with immigration expertise, participated in the first conference call occurring on December 10, during Respondent’s trip, is simply unfair. It is not required that two attorneys participate in each client meeting. The Majority also charges that Narasimhan failed to respond to the MPD’s request for a second conference call on December 21, 2009. The facts as shown by e-mails in the record are that Rogers set up a second conference call for December 21 when talking with the client during the December 10, 2009 conference call. Respondent kepi abreast of the discussions in that call by reading e-mails Haines wrote summarizing the meeting, and she sent e-mails to Rogers. *678 The record contains conflicting testimony over whether the December 21 conference call took place, and the hearing judge made no findings on this point.

. In their testimony, Haines and Dr. Samuel usually referred to Respondent by her first name, Sudha.

. In a footnote the Majority declines to establish a “bright-line rule as to what would qualify as properly ascertaining an attorney’s ‘established competence,' as each case is fact-specific.” Maj. Op. at 653 n. 7, 92 A.3d at 520 n. 7.

. Lawyers often join associations of other lawyers in the same specialty, but only a select few of these associations have measurements of expertise as a condition of membership.

. A significant aspect of the deficiencies in Form 9089, as explained by Respondent, was caused by her mistake in mailing an earlier rough draft of Form 9089 to the DOL. This submitted Form 9089 omitted significant information as required to complete sections F-2 through F- *681 6, despite MPD having provided that information to Respondent. Those sections were complete on the most current draft, which Respondent failed to send.

. This ruling was made by the Board of Alien Certification Appeals, which affirmed the initial denial of labor certification by the Certifying Officer.

. This reliance is exemplified in a May 8, 2010 e-mail in which Respondent emphatically requests Rogers to supply her with an instruction sheet for sufficiently completing a Form 9089 submission to the DOL.

. Liability in negligence is an entirely different issue.

. The documents introduced by Petitioner include 24 e-mails from Respondent to MPD from January to mid-July, 2010.

. When Dr. Samuel e-mailed "Gordon and Sudha” on April 15, 2010, for some additional information "[w]hen you have an opportunity,” Respondent e-mailed Rogers the next day, asking him to "respond to this ASAP.” On May 2, 2010, Rogers did respond to the e-mail, although his response may not have been complete. Haines described a conference call with Rogers, Respondent, Haines and Dr. Samuel on Saturday, May 8, in which that issue was discussed, and they talked about the options of refiling and appealing. Rogers guided the client as to these options, and MPD decided to resubmit a new Form 9089 to the Department of Labor, which was done on June 4, 2010. According to Haines, Respondent "respond[ed] quickly to resubmit the forms.”

. Other than a May 7 exchange, there are no e-mail communications in May or June of 2010 in which Haines or Samuel requested information or a meeting with Respondent.

. Meanwhile, the lack of success with the Form 9089 had eroded MPD’s trust in Respondent’s capabilities. In a belated effort to record the MPD's dissatisfaction with the original 9089 filing, on June 15, Haines sent a letter addressed to Rogers, indicating that she found it "prudent to send this letter in response to some ongoing issues.” She complained about the March 24, 2010 denial by the Department of *687 Labor, the delay caused by the need to resubmit Form 9089. In this regard, she said that his resume indicated that he had the “expertise, knowledge, skills and abilities necessary to respond to these immigration issues!,]” but complained that Respondent “either does not have sufficient experience to address these issues, or, she is distracted and does not pay sufficient attention to what she is doing.’’ Haines complained that the Department of Labor rejected the application because of the omission of information that MPD had provided to Respondent. She insisted: “I need some assurances that you will either deal with this matter directly or that Ms. Narasimhan be more closely supervised for all activities in the future.”

. In that e-mail she advised Dr. Samuel: “I have first-class mailed you a letter yesterday giving you an update about your 9089 form. You should receive it today or tomorrow.”

. She also complained:
"It was very difficult to get her on the phone. Definitely very difficult to meet face-to-face, and then I found that there was a lot of lag time between responses to emails, so again — it was a time-sensitive matter, so if a question popped in my mind or if Diana had a question or some other member of the department had a question, we’d shoot off an email, and response, so it was extremely difficult.”